UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| TINA KENDEL, | ) | CASE NO.  5: 09 CV 1999 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| vs. | ) | |
| | ) | |
| LOCAL 17AUNITED FOOD AND, | ) | **MEMORANDUM OF OPINION** |
| COMMERCIAL WORKERS, *et al.*, | ) | **AND ORDER** |
| | ) | [Resolving Doc. Nos. 98, 158, 164, 167] |
| | ) | |
| Defendants. | ) | |

Three motions for summary judgment in this sexual discrimination lawsuit are now

pending before the Court: (1) The Motion of Defendant United Food and Commercial Workers'

International Union ("International") for Summary Judgment (Doc. No. 98); (2) the Motion for

Summary Judgment of Defendants United Food and Commercial Workers' Union Local 17-A

("Local 17-A") and Howard Barnes in His Official Capacity (Doc. No. 164); and (3) The Motion

for Summary Judgment of Defendant Howard Barnes in His Individual Capacity (Doc. No. 158).

Plaintiff has also filed a motion to strike a "supplement" to the motion for summary judgment

filed by Local 17-A and Howard Barnes.  (Doc. No. 167).

**I.  Background**

For purposes of the pending motions, the following background facts derived from the

evidence of record will be viewed in the light most favorable to Plaintiff.  Local 17-A is a union

located in Canton, Ohio.  Local 17-A's primary duty and responsibility is to represent its

membership in collective bargaining with five food companies.  Local 17-A represents its

members during the negotiation of collective bargaining agreements (CBAs) and enters into and

1

administers CBAs on behalf of its members.  (Kendel Dep., 30-32.)

In 1988, Plaintiff was hired by Local 17-A as and administrative assistant to the then-president of the union, Gary Feiock.  (Kendel Dep., 14-15.)  As an administrative assistant, Plaintiff reported to the president, who determined her job duties, including filing, accounting, answering telephones, typing, and keeping records and notes.  (Kendel Dep., 15, 203.)

In 1999, Howard Barnes was elected by the union membership to replace Feiock as president.  Barnes continued to employ Plaintiff as an administrative assistant in the union office. In addition, in 1999, Barnes appointed Plaintiff to the position of secretary-treasurer, a Local 17-A officer and board-member position.  (Barnes Dep. 36; Kendel Dep. 15-16.)  Plaintiff was subsequently elected as secretary-treasurer in 2002 and was re-elected in 2005 and 2008. (Kendel Dep., 17-18.)  At all times since 1999 to the present, Plaintiff held the positions of administrative assistant and secretary-treasurer.

Plaintiff had no problems with her working environment or Barnes' treatment of her for approximately four years.  However, Plaintiff alleges that, beginning approximately in January 1, 2003, Barnes began making degrading and harassing sexual comments toward her.  (Kendel Dep. 166.)  These inappropriate, sexually-explicit comments are detailed in Plaintiff's complaint and include such comments as Barnes stating that "women needed to be beaten down," "women need to learn how to such cock," "women are dumb," "women are cunts and their vaginas need to be sewed up," "If my wife did that to me she would only do it once – I would knock her down where she wouldn't do it again," and "you better be afraid of me or I'll bring my guns out and bury you in a hole in my yard."  In addition, Plaintiff testified that Barnes used comments like "cunt" and "fucking cunt" toward women in the office although he did not use those words

2

directly to her.  (Kendel Dep., at 333.)

Plaintiff is the only witness who testified as to firsthand knowledge that Barnes used sexually-derogatory comments toward her.  However, Plaintiff told others that Barnes used such comments.  Further, witnesses testified that Barnes generally used sexist, sexually-derogatory and racist comments in the union office when he was angry or dissatisfied.  (*See* Feiock Dep. at 27-28; Meredith Dep. at 97-98; Brady Dep. at 28-29.)

In addition to the alleged sexually-derogatory verbal attacks, Plaintiff testified that Barnes began consistently berating her and complaining about her and her work in front of others.  He allegedly excluded her from attending union meetings and negotiations that she was entitled to attend.  Others witnessed hostility between Barnes and Plaintiff.  Plaintiff and others testified that Barnes' hostile behavior toward Plaintiff was motivated by his belief that Plaintiff was a threat to Barnes and that he believed Plaintiff was going to run for his position.

According to Plaintiff, the tension between her and Barnes escalated to the point that on January 7, 2008, Barnes physically assaulted her and attempted to choke her.  Plaintiff testified to the following events.  Barnes came into her office and told her that he needed to talk to her in his office.  When she went to Barnes' office, Barnes complained to Plaintiff that she was handling members' lost time hours incorrectly.  (Kendel Dep. at 273-79).  The two disputed how to handle the situation.  According to Plaintiff, Barnes became angrier and angrier and stated,  "I know what this is.  You're sticking votes in our bra."  (Kendel Dep. at 281).  At this point, Plaintiff testified that she told Barnes to stop, that what he was doing was against the law and that she got up to leave.  Barnes followed her, stating:  "I'll show you what's against the law" and then grabbed Plaintiff and attempted to choke her.  (Kendel Dep. at 286.)  However, Plaintiff

was able to get away, return to her desk, call her husband, grab her purse and other items and leave the building.  (Kendel Dep. at 287).  When Plaintiff reached her car, she called 911. (Kendel Dep. at 292.)  Two Canton police officers responded to the call.  However, no criminal charges were brought against Barnes, and there is no police report of the incident in evidence.

Plaintiff testified that after this incident, she feared for her life and was afraid to go back to work.  Thereafter, she performed her work from home.  On January 17, 2008, about ten days after the alleged encounter with Barnes, Barnes was defeated for re-election as president of the union by Sonja Campbell.  (Kendel Dep. at 573).  Barnes did not return to work after his defeat and retired from the plant on or about January 18, 2008.  Plaintiff returned to work at the union office under President Campbell.

Plaintiff asserts that she and another Local 17-A Board member, Barbara Meredith, had complained about Barnes's conduct toward her to the Local 17-A Board and that the Board was aware of his conduct; yet, the Board failed to take any action.  There is no mention of any complaints by Plaintiff in the Board's minutes.

ln January 13, 2008, four days before Barnes was defeated in the election, Plaintiff sent a letter to Joseph Hansen, president of the International, complaining of Barnes' conduct and requesting an "immediate response" and an investigation.  Plaintiff's letter requested that the International take "appropriate measures to insure that a safe work environment is available so that [she] may be allowed to continue in my elected capacity and resume all duties of the position of Secretary Treasurer."  Hansen responded to Plaintiff in a letter dated January 18, 2008.  Hansen's letter stated that although Local 17-A was an autonomous body and was not Plaintiff's employer, Plaintiff's allegations would be investigated as they pertained to Plaintiff as

4

a union member.  Plaintiff received Hansen's letter on or about January 18, 2008.  (Kendel Dep. at 81.)

Lawyers employed by International in fact conducted an investigation of the situation. Plaintiff and the witnesses Plaintiff identified were contacted by lawyers at a law firm employed by the International.  (Kendel Dep. at 89.)  Following the investigation, International's lawyer, Mady Gilson, prepared a report dated April 2, 2008.  Gilson found that although there had been "bitter internal politics" at Local 17-A and that the working relationship between Plaintiff and Barnes "was extremely difficult and at times unprofessional," no further action in connection with the situation was necessary in that, by the time of the investigation and report, Plaintiff and Barnes were no longer working together as Barnes was defeated as president and retired from the plant and Plaintiff reported that she was able to perform her duties under the new president.

On July 2, 2008, Plaintiff filed a charge of discrimination against Local 17-A with the Ohio Civil Rights Commission.  The OCRC found no probable cause to find that Local 17-A engaged in unlawful conduct.  The EEOC adopted the findings of OCRC and issued Plaintiff a right-to-sue letter.

On August 26, 2009, Plaintiff filed this lawsuit against Local 17-A, the International and Howard Barnes in his official capacity as former president of Local 17-A and in his individual capacity.  Plaintiff alleges three causes of action against all defendants:  sexual discrimination in violation of Title VII of the Civil Rights Act of 1964 (first cause of action), intentional infliction of emotional distress under Ohio law (second cause of action), and sexual discrimination in violation of Ohio Revised Code § 4112 (third cause of action).

**II.  Standard of Review**

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).  The burden of establishing that there is no genuine issue of material fact lies with the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In evaluating a motion for summary judgment, the Court must construe the evidence and draw all reasonable inferences in the light most favorable to the non-moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Once the moving party has satisfied its burden of proof, the burden then shifts to the non-moving party.  The non-moving party may not simply rely on its pleadings; rather it must "produce evidence that results in a conflict of material fact to be resolved by a jury." *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1996).  A fact is "material" only if its resolution will affect the outcome of the lawsuit.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242248 (1986).  Moreover, Fed. R. Civ. P. 56(e)(2) provides:

> When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial.  If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

**III.  Analysis**

**1.  Sexual Harassment**

Ohio courts have held that federal case law interpreting Title VII "is generally applicable" to cases involving sexual harassment claims under state law.  *Hawkins v. Anheuser - Busch, Inc.*, 517 F.3d 321, 332 (6th Cir. 2008) (citing *Hampel v. Food Ingredients Specialties,*

6

*Inc.*, 89 Ohio St.3d 169, 729 N.E.2d 726, 731 (Ohio 2000).  Therefore, analysis of Plaintiff's Title VII claim also pertains to Plaintiff's claim of sexual harassment under the Ohio Revised Code.

Title VII provides:  "It shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ."  42 U.S.C. § 2000e-2(a)(1). To prove a claim for sexual harassment under Title VII, a plaintiff need to show either *quid pro quo* sexual harassment or hostile work environment sexual harassment.  *Roelen v. Akron Beacon Journal*, 199 F. Supp.2d 685, 693 (N.D. Ohio 2002).

Plaintiff alleges she was subjected to hostile work environment sexual harassment.[1]  To establish a *prima facie* case of sexual harassment based on a hostile work environment, a plaintiff must demonstrate that:  (1) she is a member of a protected class; (2) she was subjected to harassment, either through words or actions, based on sex; (3) the harassment had the effect of unreasonably interfering with plaintiff's work performance and creating an objectively intimidating, hostile, or offensive work environment; and (4) there exists some basis for liability on the part of the employer.  *Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 270 (6th Cir. 2009).

*Local 17-A and Howard Barnes in His Official Capacity*

Local 17-A and Howard Barnes in his official capacity move for summary judgment under the second, third and fourth prongs of the *prima facie* test.  They argue that: (1) Plaintiff

---

[1]*Quid pro quo* harassment occurs when a plaintiff's submission to unwelcomed sexual advances or requests for sexual favors is an express or implied condition of receiving job benefits, or when a plaintiff's refusal to submit to such demands results in a tangible job detriment. *Roelen*, 199 F.Supp.2d at 693.

cannot show she was subject to harassment "based on sex" because Barnes was an "equal opportunity" abuser and treated men and women with equal hostility and coarse and vulgar language was commonplace in the union office (even by Plaintiff); (2) Plaintiff cannot show the alleged harassment was "severe and pervasive" and had the effect of unreasonably interfering with Plaintiff's work performance because Plaintiff never lost her job or a day's pay and was able to perform her duties throughout the entire period of alleged wrongdoing; and (3) there is no basis for employer liability under the *Ellerth/Faragher* affirmative defense, pursuant to which an employer is not liable for the sexual harassment of an employee if the employer shows by a preponderance of the evidence "that it exercised reasonable care to prevent and correct promptly any sexually harassing behavior" and  the employee claiming harassment "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Balding-Margolis v. Cleveland Arcade*, 352 Fed. Appx. 35, 44 (6th Cir. 2009).

Plaintiff disputes these contentions.

Upon consideration of the evidence of record, the Court finds there is sufficient evidence to preclude summary judgment on Plaintiff's sexual harassment claims against Local 17-A and Barnes in his official capacity.  First, there is sufficient evidence to create a material issue as to whether Plaintiff was subject to harassment "based on sex."  In *Gallagher*, the Sixth Circuit held that use of sex-specific language in the workplace – such as the use of derogatory words such as words like bitch, whore and cunt – are sufficient to satisfy the "based on sex" element of a *prima facie* sexual harassment claim, even when the language does not specifically target the plaintiff and even when men and women alike are exposed to the same offensive words.  *Gallagher*, 567

8

F.3d at 272.  The Court reasoned that such "sex-specific" language – even if directed indiscriminately in the workplace – is properly deemed more offensive to women than men by virtue of its intrinsically degrading nature to women.  *See id.*  There is evidence that Barnes frequently used the type of sexually-explicit and derogatory language found by the Sixth Circuit in *Gallagher* to be "based on sex" in the union office.  Accordingly, pursuant to *Gallagher,* there is sufficient evidence to create at least a material issue of fact as to whether Plaintiff experienced harassment "based on sex."

There is also sufficient evidence to create an issue of fact as to whether Barnes' conduct had the effect of creating a hostile work environment under the third prong of the *prima facie* test.  As to this element, the Sixth Circuit has stated:

> Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment – an environment that a reasonable person would find hostile or abusive- is beyond Title VII's purview.  Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

*Williams v. Gen. Motors Corp.*, 187 F.3d 553, 566 (6th Cir. 1999).  In *Gallagher*, the Sixth Circuit clarified that an employee is not required to show that the alleged harassment is both subjectively and objectively severe and pervasive.  *Gallagher*, 567 F.3d at 274.  Rather, the employee must show that "the environment is objectively hostile and the harassment subjectively severe and pervasive."  *Id.  See also Williams*, 187 F.3d at 568 ("The focus of the objective/subjective inquiry should remain on (1) whether a reasonable person would find the environment objectively hostile, and (2) whether the plaintiff subjectively found the conduct 'severe and pervasive.'").

Local 17-A contends there is insufficient evidence to show either that Plaintiff's work

environment was objectively hostile or that Plaintiff was subjectively affected by Barnes' alleged treatment of her.  It argues that Plaintiff's workplace was not objectively intolerable because several female witnesses testified that they did not believe Barnes treated women inappropriately and profanity and coarse language was generally used in the union office.  However, considering the totality of the evidence as described in Plaintiff's deposition in the light most favorable to Plaintiff, a reasonable person could have found the union office – permeated with constant sex-specific and demeaning language by Barnes coupled with Barnes' harsh criticism and treatment of Plaintiff, which culminated in an attempted physical attack on her –  to be "objectively hostile."

Further, the evidence is sufficient evidence to support a reasonable finding that Plaintiff subjectively found Barnes alleged conduct "severe and pervasive."  Although Plaintiff continued to go to work and do her job well after she contends the harassment began and did not make a "formal" motion with the board to terminate Barnes, there is evidence that: Plaintiff complained to others about Barnes; Plaintiff's demeanor changed; Plaintiff undertook to document Barnes' conduct toward her; Plaintiff called the police after encountering Barnes on January 7, 2008; and Plaintiff did not return to work at the union office after their encounter until Barnes was no longer working there.  This evidence, viewed in the light most favorable to Plaintiff, is sufficient to create a genuine issue as to whether Plaintiff was subjected to such severe and pervasive harassment as to unreasonably interfere with her work performance and create a hostile work environment.

There are also material issues as to whether there is a sufficient basis to impose liability on Local 17-A under the so-called *Ellerth/Faragher* defense.  In *Burlington Industries, Inc. v.*

10

*Ellerth*, 524 U.S. 742 (1998), the Supreme Court held that an employer has an affirmative defense to a hostile work environment claim that does not result in a tangible employment action such as termination.  To establish this affirmative defense, the employer must show:  "(a) that the employer exercised reasonable care to prevent and correct promptly and sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Burlington*, 524 U.S. at 765; *accord Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998).

Local 17-A contends there "[t]here is no evidence that Local 17-A failed to exercise reasonable care to prevent sexual harassment" and Plaintiff, a board member who knew how to make formal motions for board action, never made a motion to terminate Barnes.  (Local 17-A Opp. at 16; Rep. at 8.)  However, it is Local 17-A's burden to establish the existence of the affirmative defense.  Local 17-A has not demonstrated that it promulgated and enforced a sexual harassment policy (or otherwise exercised reasonable care to prevent sexual harassment). Plaintiff contends Local 17-A has no sexual harassment policy.  Thus, material issues of fact exist as to whether Local 17-A had a procedure for the receipt and correction of complaints of sexual harassment and exercised reasonable care to prevent sexual harassment.  Further, as to the second prong of the defense, requiring the defendant to show that Plaintiff failed to take advantage of preventative or corrective measures, there is evidence that Plaintiff informally complained of Barnes' conduct to at least some of Local 17-A board members.  Although Local 17-A contends it is incomprehensible that Plaintiff "would not take advantage of her opportunities as a Board Member to make formal requests for Board action," a material issue of fact is at least presented as to whether Plaintiff "unreasonably failed to take advantage of any

11

preventive or corrective opportunities" that existed.

In sum, material issues of fact exists as to second, third and fourth elements of a *prima facie* sexual harassment case against Local 17-A and Howard Barnes in his official capacity as president.

Four days after the deadline for filing dispositive motions, Local 17-A and Barnes filed a "supplement" to their motion for summary judgment, arguing that they should be granted summary judgment on Plaintiff's sexual harassment claims for the more "obvious reason" that became Plaintiff cannot show that Local 17-A is an "employer" under either Title VII or Ohio Rev. Code § 4112.  Specifically, Local 17-A and Barnes argue that Local 17-A had only three employees, short of the number required to be an "employer" under Title VII, which requires fifteen or more employees and Ohio Rev. Code § 4112, which requires a minimum of four employees.  In support, defendants submit "Form LM-2" labor organization annual reports and they rely on deposition testimony of Kendel and Barnes that only Barnes, Kendel and Carmen Brady worked in the union office.

Plaintiff moves to strike the supplement (as well as Local 17-A's original summary judgment motion) and seeks an award of attorneys' fees and costs (Doc. No. 167) on the grounds that: (1) Local 17-A and Barnes did not seek an extension of the dispositive motion deadline (and thus waived their right to raise the numerosity argument); and (2) Defendants' original brief in support of summary judgment and the supplement exceed the Court's twenty-page dispositive motion page limitation.  Plaintiff also argues that she "can show that Defendant Local 17-A is an employer under state and federal law."  She submits employee payroll records and her own affidavit in which she states that the payroll records demonstrate that Local 17-A employed 25

12

persons in 2005, 26 persons in 2006, 31 persons in 2007, 33 persons in 2008, and 28 persons in 2009.

The parties do not address the legal requirements for determining whether a person is an "employee" for purposes of Title VII or Ohio Rev. Code § 4112.  In considering Plaintiff's charge of discrimination, the OCRC found that Local 17-A "employs more than 15 persons."  On the present record, a material issue of fact exist as to the number of employees of Local 17-A.  Further, defendants did not seek leave to supplement their motion for summary judgment or to exceed this Court's dispositive motion page limitation.  Accordingly, Defendants' supplement will not be considered as a basis for summary judgment.[2]

*Barnes in His Individual Capacity*

Barnes has not demonstrated a basis for granting him summary judgment on Plaintiff's sexual harassment claim against him in his individual capacity under Ohio Rev. Code § 4112.[3]  Barnes contends the claim against him under Ohio Rev. Code § 4112 "cannot continue" because all of the conduct of which Plaintiff complains "could only have been taken by Barnes in his official capacity."  However, as Barnes concedes, unlike Title VII, Ohio law permits employment discrimination claims against individual supervisors.  *See Genaro v. Cent. Transp.*, Inc., 84 Ohio St.3d 293, 300 (Ohio 1999) ("Accordingly, we . . . hold that for purposes of R.C. Chapter 4112, a supervisor/manager may be held jointly and/or severally liable with her/his employer for discriminatory conduct of the supervisor/manager in violation of R.C. Chapter 4112.").  Summary judgment is not warranted merely on the basis of Barnes' assertion that "the

---

[2]However, the Court will not impose sanctions on Defendants as requested by Plaintiff.

[3]Plaintiff previously withdrew her claim under Title VII against Barnes individually.

13

credible facts of this case do not show that Barnes took any discriminatory action against [Plaintiff] in his individual capacity."

Barnes also argues that he is entitled to summary judgment because the statute of limitations for a state-law claim of assault and battery expired by the time the case was filed. However, as Plaintiff points out, she has not alleged a claim against Barnes for assault and battery under Ohio law; she has alleged a state-law sexual harassment claim under Ohio Rev. Code § 4112.  The statute-of-limitations for assault and battery is not relevant and does not provide a valid basis for summary judgment on the claim against Barnes in his individual capacity.

### The International

The International contends that it is entitled to summary judgment on Plaintiff's sexual harassment claims because the International and Local 17-A are separate legal entities and the International is not responsible for the conduct of Barnes.

As a general rule, an international union and its affiliated locals are deemed to be separate legal entities.  *EEOC v. Int'l Bro. of Elec. Workers*, Case No. 3: 02 CV 7374, 2005 WL 469600, at * 2 (N.D. Ohio Feb. 28, 2005).  An international union may be liable for the actions of a local chapter or its officers only when the union may be found responsible according to common-law principles of agency.  *Carbon Fuel Co. v. Mine Workers*, 444 U.S. 212, 216 (1979).  As the Sixth Circuit stated in *Alexander v. Local 496, Laborers*, 177 F.3d 394, 409 (6th Cir. 1999), the common law agency theories of vicarious liability mean that "a plaintiff must adduce specific evidence that the international 'instigated, supported, ratified, or encouraged' [discriminatory] actions, or 'that what was done was done by their agents in accordance with

14

their fundamental law of association.'" (citing *Carbon Fuel*, 444 U.S. at 217-18.).  Furthermore, while restrictions on a local union's autonomy derived from an international union's constitution are relevant, what matters for purposes of determining whether an agency relationship exists "is not so much the International's theoretical control over the local as the nature and extent of actual control."  *Shimman v. Frank*, 625 F.2d 80, 98, n. 36 (6th Cir. 1980).  To analyze the actual relationship, the relevant inquiry is whether the local union had substantial autonomy in the handling of its own affairs.  *See id.* at 98.

The International points to evidence in the record establishing that: Plaintiff was hired and employed by Local 17-A only; Local 17-A's primary responsibility is to represent its membership; Local 17-A's business is to enter into and administer CBAs with employers; the International is not a signatory to and plays no role in administering the CBAs; and the International plays no role in filing grievances or in processing grievances to arbitration under the CBAs.

In support of her contention that the International is vicariously liable for the conduct of Barnes, Plaintiff points to the general rights and abilities of the International to oversee and control the conduct of Local 17 pursuant to International's Constitution.  Specifically, Plaintiff asserts that the International: (1) "can go into local unions and check its Bylaws to make sure that there are adequate policies in place and then inform officers that it expects them to behave under those types of policies"; (2) "has a right to go into Local 17-A to assure that the objectives of the International are being adhered to"; (3) "can impose a 'trusteeship' on the Local," which allows the International to remove an officer and take control of the local when the International determines the local is not servicing its members correctly; (4) can take action against an officer

15

"if the International believes that an officer steps outside the bounds of the Constitution"; and (5) "has authority to come in investigate and correct" complaints filed against the Local by its members. However, Plaintiff identifies only the following instances of actual involvement of the International in Local 17-A's day-to-day affairs. First, "there were times when representatives from the International appeared at negotiations" and exerted "such control over these negotiations that [the Local A's Recording Secretary Meredith] received questions from members as to why the International was so involved." Second, after Gary Feiock left the presidency, he was hired to perform work for the International and the International sent subsidies to Local 17-A for his wages.

Even viewed most favorably to Plaintiff, Plaintiff's evidence as to the International's involvement with Local 17-A is insufficient to demonstrate an agency relationship. Plaintiff's evidence shows that the International possessed potential control of Local 17-A and its officers; however, the actual involvement of the International amounts, at most, to the International's participation in negotiations and provision of financial assistance to pay Feoick. The reasoning of the court in *EEOC v. Int'l Bro. of Elec. Workers*, 2005 WL 469600, which found a similar level of involvement of an international union with a local union insufficient to establish and agency relationship, is persuasive and applicable here. Finding no agency relationship, the *Local 998* court held:

> Neither the general attributes, based in the International's Constitution, of the International's relationship with Local 998 nor its specific activities on behalf of Local 998 show that there was an agency relationship between the two entities. Requiring conformity to some general requirements, as prescribed by the International's Constitution, did not subject either the general or daily operations of Local 998 to the International's control.
>
> Likewise, the fact that the International or its representatives attended some

16

> negotiating sessions, gave advice about collective bargaining, assisted in
> arbitrations, resolved internal disputes with the Local 998, and provided modest
> financial assistance did not dissolve the legal distinction between the Local 998
> and the International.  There is nothing to indicate that the International's
> assistance made it dominant, or enabled it to dictate how the Local 998 went
> about its work for Lithonia's employees.  That the International provided service
> did not make it Local 998's servant, or vice versa.

2005 WL 46900, at *3.

Plaintiff attempts to distinguish *Local 998* on the basis that the International responded

her complaint of harassment and to the Ohio Civil Rights Commission.  Plaintiff contends this

"shows that the International exerted supervisory control over Local 17-A."  The Court

disagrees.  That the International responded to a complaint of discrimination regarding the

conduct a Local 17-A officer –  after Plaintiff sent a letter to the International specifically

requesting that the International take action –  does not demonstrate that the International

controlled, or controls, the day-to-day activities of Local 17-A such that vicarious liability may

be imposed.

Plaintiff alternatively argues that the International is liable for Barnes' conduct even in

the absence of an agency relationship because employees/officers of the International witnessed

Barnes' treatment of her at the labor negotiations but took no action; thus, the International

condoned or acquiesced in sexual harassment by Barnes.  However, the evidence shows that the

International promptly took action after it received Plaintiff's January 13, 2008 letter

complaining of sexual harassment.  Plaintiff testified that she wrote the January 13th letter to

make everyone aware of what Barnes was doing to her.  (Kendel Dep. at 300.)  There is

insufficient evidence to support a reasonable finding that the International had knowledge of

sexual harassment and acquiesced in it.

17

Based on all of the foregoing, there is an insufficient basis to impose liability on the International for the alleged conduct of Barnes, and the International is entitled to summary judgment on Plaintiff's sexual harassment claim.  However, Local 17-A and Barnes, in his official and individual capacities, are not entitled to summary judgment on the sexual harassment claims.

### 2. Intentional Infliction of Emotional Distress

To prevail on a claim of intentional infliction of emotional distress under Ohio law, a plaintiff must prove:

> 1) that [defendant] either intended to cause emotional distress of knew or should have known that actions taken would result in serious emotional distress to the plaintiff; 2) that the [defendant's] conduct was so extreme and outrageous as to go 'beyond all possible bounds of decency' and was such that it can be considered as 'utterly intolerable in a civilized community'; 3) that the [defendant's] actions were the proximate cause of plaintiff's psychic injury; and 4) that the mental anguish suffered by plaintiff is serious and of a nature that 'no reasonable man could be expected to endure it.'"

*Pyle v. Pyle*, 11 Ohio App.3d 31, 34, 463 N.E.2d 98 (Ohio 1983).  *See also Phung v. Waste Management*, 71 Ohio St.3d 408, 410, 644 N.E.2d 286 (Ohio 1994).

The Ohio Supreme Court has emphasized that "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities" are insufficient to give rise to a claim of intentional infliction of emotional distress.  *Yeager v. Local Union 20*, 6 Ohio St. 3d 369, 453 N.E.2d 666 (Ohio 1983).  Rather, defendant's conduct must be:

> so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.  Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'"

*Id.*, quoting Restatement of the Law 2d, Torts 73, Section 46, comment d (1965).

18

Further, the plaintiff must show serious emotional distress. *Yeager,* 6 Ohio St.3d 369 at 374. Serious emotional distress describes emotional injury that is both severe and debilitating, causing a reasonable person, normally constituted, to be unable to cope adequately with the mental distress engendered by the circumstances of the case. *Paugh v. Hanks,* 6 Ohio St.3d 72, 78 (Ohio 1983).

There is insufficient evidence to support a claim of intentional infliction of emotional distress claim against the International. Plaintiff testified in her deposition that the basis of her emotional distress claim against the International is that representatives of the International observed Barnes' conduct toward her during labor negotiations but took no steps to prevent it and that the International failed to timely respond to her complaint of sexual harassment. (Kendel Dep. at 134-35.). Even if viewed in the light most favorable to Plaintiff, this conduct cannot reasonably be considered so extreme and outrageous as to go "beyond all possible bounds of decency" and "utterly intolerable in a civilized community" as required to support a claim for intentional infliction of emotional distress under Ohio law. Plaintiff also argues that the International is liable because "Barnes' behavior was extreme and outrageous." However, as discussed above, there is insufficient evidence to hold the International vicariously liable for the conduct of Barnes.

Plaintiff has also failed to come forward with sufficient evidence to survive summary judgment on her emotional distress claim against Local 17-A and Barnes. The only evidence Plaintiff identifies in her opposition to demonstrate that she suffered emotional distress is her own affidavit, in which Plaintiff states that she "suffered severe emotional distress," "anxiety," "sleeplessness and nightmares" due to Howard Barnes and that she "broke down crying on

19

several occasions because of Howard Barnes' sexual and demeaning derogatory remarks." Plaintiff also states that her "physician prescribed [her] Xanax due to [her] anxiety" and that her emotional distress "turned into physical symptoms; such as, backaches, stress headaches, and pain and numbness in her arms."  (*See* Doc. No. 141-15.)

However, in Ohio, a plaintiff claiming a severe and debilitating injury must present a guarantee of genuineness in support of this claim, such as expert evidence, to prevent a court from granting summary judgment to the defendant.  *Knief v. Minnich*, 103 Ohio App.3d 103, 108 (Logan Cty. Apr. 12, 1995).  Plaintiff has offered no expert testimony supporting her claim that she suffered from the anxiety and the physical symptoms she asserts, or that the symptoms resulted from Barnes' conduct.  Plaintiff's affidavit is insufficient to demonstrate that she suffered severe and debilitating emotional injury proximately caused by Barnes' treatment of her.  *See Oman v. Advance Auto Parts, Inc.*, Case No. 3:02CV7581, 2003 WL 22722952, at *7 (N.D. Ohio Oct. 28, 2003) ("Plaintiff's affidavit or deposition testimony claiming severe distress, such as offered in this case, is insufficient.").

Furthermore, Plaintiff's asserted problems, even if true, are not sufficiently serious and of a nature that "no reasonable man could be expected to endure" them.  *See, e.g., Campbell v. Triad Financial Corp.*, Case No. 5:07CV579, 2007 WL 2973598 (N.D. Ohio Oct. 9, 2007) (sleeplessness and nervousness not sufficiently severe and debilitating); *Brooks v. Lady Foot Locker*, Case No. 22297, 2005 WL 1163018 (Summit Cty. May 18, 2005) (worries, nightmares and headaches insufficient to show severe emotional distress); *Rice v. Cuyahoga Cty. Dept. of Justice*, Case No. 85576, 2005 WL 2467058 (Cuyahoga Cty. Oct. 6, 2005) (although employee saw psychologist due to anxiety at work, was depressed, had chest pains and knots in his

20

stomach, had difficulty sleeping, was moody and took a five-week medical leave, the fact that employee continued employment without difficulty indicated employee's distress not severe and debilitating).

All defendants are entitled to summary judgment on Plaintiff's claim of intentional infliction of emotional distress.

### IV.  Conclusion

In accordance with the foregoing:

(1) the International's motion for summary judgment (Doc. No. 98) is GRANTED as to all claims against the International;

(2) the motion for summary judgment of Local 17-A and Howard Barnes in his official capacity (Doc. No. 164) is GRANTED as to Plaintiff's claim for intentional infliction of emotional distress but DENIED as to Plaintiff's claims under Title VII and Ohio Rev. Code § 4112;

(3) the motion for summary judgment of Howard Barnes in his individual capacity (Doc. No. 158) is GRANTED as to Plaintiff's claim for intentional infliction of emotional distress but DENIED as to Plaintiff's claim under Ohio Rev. Code § 4112; and

(4) Plaintiff's motion to strike the supplement filed by Local 17-A and Barnes in his official capacity is GRANTED in part.  The supplement will not be considered as a basis for summary judgment.

IT IS SO ORDERED.

Date: September 16, 2010          ___/s/ John R. Adams_____
                                 JOHN R. ADAMS
                                 United States District Judge