ADAMS, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| TINA KENDEL | ) | |
| | ) | CASE NO. 5:09cv1999 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| LOCAL 17-A UNITED FOOD AND | ) | ORDER |
| COMMERCIAL WORKERS, et al., | ) | (Resolves Doc. 347, 348) |
| | ) | |
| Defendants. | | |

## I.  <u>Introduction</u>

On January 27, 2011, following a jury trial, judgment was entered in favor of Defendants Local 17-A and Howard Barnes in his official and individual capacities (collectively "Defendants").   In her post-trial motions, Plaintiff Tina Kendel now seeks judgment as a matter of law, alteration or amendment of the judgment or a new trial.

Before reviewing Kendel's pending motion, it is important to understand the backdrop of this litigation.   From the date of the filing of this litigation on August 26, 2009 it was apparent that Kendel's claims would rise or fall on her own credibility.   A passing glance at the evidence submitted in this matter – particularly Kendel's own notes – might suggest that her credibility was significantly bolstered by contemporaneous documentary evidence.   However, a closer review reveals that Kendel's conduct surrounding these notes actually did more to damage her credibility than bolster it.

As early as her own deposition, Kendel set the stage to manipulate or massage her "notes"

1

to support whatever her final theory of liability came to be.   During Kendel's two depositions, Defendants requested time and again any and all of her notes.   Counsel was told time and again that all the notes that had been currently located had been produced and that discovery would be supplemented following the discovery of any new notes.   Moreover, when Kendel was questioned about the contents of her notes, she was more-often-than-not evasive and non-responsive, leaving the door open for her testimony to be altered or tweaked during trial.

In its manifest weight review below, the Court has thoroughly reviewed all of Kendel's testimony at trial and the issues surrounding her notes.   While explained in more detail in that review, the Court notes that it became clear during trial that Kendel had created three different versions of her notes.   The first version of the notes was handwritten and was allegedly taken contemporaneously with the events in question.   The next version was typed and submitted to the Ohio Civil Rights Commission, well before the inception of this case.   Finally, Kendel created a version of her notes for this litigation.

Defendants' counsel presented a compelling argument through cross-examination that Kendel had manufactured her latest version of notes from scratch in order to more fully support her current trial testimony.   The Court would note that Defendants' argument on that point is more properly an issue related to sanctions.   As such a request for sanctions is pending, the Court will not analyze such an issue herein.   However, as more fully discussed below, this cross-examination served to highlight Kendel's ever-changing documentary evidence and evasive responses and effectively destroyed Kendel's credibility before the jury.   With this backdrop in mind and based upon the more thorough review of the totality of the evidence conducted below, Kendel's post-judgment motions are hereby DENIED.

2

## II.     **Procedural History**

On February 14, 2011, Kendel filed her renewed motion for judgment as a matter of law or, in the alternative alteration or amendment of the judgment or, in the alternative, motion for new trial. Doc. 316. Also on February 14, 2011, Kendel filed her motion for a mistrial based upon the admission of Mady Gilson's Testimony. Doc. 317.

On June 22, 2011, the Court issued an order noting that Kendel's arguments centered on testimony and events that occurred throughout the trial but to date she had not ordered an official copy of the transcript. Doc. 334. The Court concluded that it could not determine the merits of Kendel's arguments without the transcript. As such, the Court ordered Kendel to order an official copy of the transcript and upon filing of the official transcript to file amended motions with specific transcript citations to support her arguments. The Court further noted that it while it would not consider any *new* arguments in these amended motions Kendel could *remove* arguments that upon review of the transcript were found to be without merit. Thereafter, the official transcript was filed and on August 31, 2011, Kendel filed her amended motions. Doc. 347 and Doc. 348. The Defendants responded. The matters are now fully briefed before this Court.

## III.     **Kendel's Motion (Doc. 347)**

Plaintiff Tina Kendel's motion is captioned as a "renewed motion for judgment as a matter of law or, in the alternative alteration or amendment of the judgment or, in the alternative, motion for new trial (pursuant to Fed.R.Civ.P. 50 and 59)." Although seemingly recognizing that these remedies are in the alternative and that they have different standards and applicable law, Kendel has essentially intertwined her arguments creating much confusion. However, her motion is easily reviewed by the Court based upon the record in this matter.

3

### a. <u>Renewed Judgment as a Matter of Law (Rule 50)</u>

With regard to the Renewed Motion for Judgment as a Matter of Law, the Court will "consider[ ] the evidence in a light most favorable to the party against whom the motion is made, giving that party the benefit of all reasonable inferences," *Tuck v. HCA Health Services of Tennessee, Inc.*, 7 F.3d 465, 469 (6th Cir.1993), "without weighing the credibility of witnesses or considering the weight of the evidence." *McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1163 (6th Cir.1990) (quoting *Gootee v. Colt Industries, Inc.,* 712 F.2d 1057, 1062 (6th Cir.1983)).   The jury's verdicts must be supported by "substantial evidence."  *PowerTek Solutions Services, LLC v. Techlink, Inc.,* 403 F.3d 353, 358-59 (6th Cir.2005).   If the evidence points so strongly in favor of the movants that reasonable minds could not reach a different conclusion, judgment as a matter of law is appropriate.  *Jordan v. City of Cleveland*, 464 F.3d 584, 594 (6th Cir.2006); *Cline v. U.S.*, 997 F.2d 191, 196 (6th Cir.1993).   "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986).

### b. <u>Alteration or Amendment of the Judgment (Rule 59)</u>

Fed.R.Civ.P. 59(e) contemplates a motion to amend or alter a judgment.  "Rule 59(e) motions serve a limited purpose and should be granted for one of three reasons: (1) because of an intervening change in controlling law; (2) because evidence not previously available has become available; or (3) because it is necessary to correct a clear error of law or preventing manifest injustice."  *Boler Co. v. Watson & Chalin Mfg., Inc.*, 372 F.Supp.2d 1013, 1025 (N.D.Ohio 2004) (quoting *General Truck Drivers, Chauffeurs, Warehousemen & Helpers, Local No. 957 v. Dayton Newspapers, Inc*., 190 F.3d 434, 445 (6th Cir.1999) (Clay, J. dissenting), cert. denied, 528 U.S.

4

1137 (2000)).   "Rule 59 is not intended to give a disgruntled litigant the opportunity to re-argue his case or to re-litigate previously-decided matters."   *Hughes v. Haviland*, No. 1:04CV593, 2007 WL 3376653 (N.D.Ohio Oct.16, 2007) (citing *Sault Ste. Marie Tribe of Chippewa Indians v. Engler*, 146 F.3d 367, 374 (6th Cir.1998)).

### c.  New Trial (Rule 59)

Fed.R.Civ.P. 59(a)(1) provides that "[t]he court may, on motion, grant a new trial on all or some of the issues ... after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court[.]"   The Court, in considering a motion for a new trial, must weigh the evidence, compare the opposing proofs, and set aside the verdict if it is of the opinion that the verdict is against the clear weight of the evidence.   *J.C. Wyckoff & Associates v. Standard Fire Ins.* Co., 936 F.2d 1474, 1487 (6th Cir.1991) (citing TCP Industries, Inc. v. Uniroyal, Inc., 661 F.2d 542, 546 (6th Cir.1981)). The Court should deny the motion if the verdict is one which could reasonably have been reached.   *Id.*   The verdict is not unreasonable simply because different inferences and conclusions could have been drawn or because other results are more reasonable.   *Id.* See, also, *Duncan v. Duncan*, 377 F.2d 49, 52 (6th Cir.), cert. denied, 389 U.S. 913 (1967).   Furthermore, where the verdict is reasonable, the motion should be denied "regardless of whether the trial judge might have reached a different conclusion were he the trier of fact."   *Wayne v. Village of Sebring*, 36 F.3d 517, 525 (6th Cir.1994) (citing *U.S. v. L.E. Cooke Co., Inc.,* 991 F.2d 336, 343 (6th Cir.1993)).

As stated in *Barnes v. Owens-Corning Fiberglas Corp.,* 201 F.3d 815, 820-21 (6th Cir.2000),

... new trials are not to be granted on the grounds that the verdict was against the weight of the evidence "unless that verdict was unreasonable [.]" *Holmes v. City of Massillon,* 78 F.3d 1041, 1047 (6th Cir.1996). Thus, if a reasonable juror could reach the challenged verdict, a new trial is improper. See *id.* at 1048. "'[C]ourts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable.'" *Duncan*, 377 F.2d at 52 (citation omitted)....

### d. **Analysis**

#### i.  Manifest Weight

Kendel contends that the jury verdict was against the manifest weight of the evidence. While she does not specifically delineate whether this argument supports her motion for judgment as a matter of law, her alternative motion to amend or alter the judgment or her alternative motion for a new trial, the Court concludes that a review of the weight of the evidence will effectively dispose of all three motions

The Court realizes that when deciding a motion for judgment as a matter of law, it is cannot consider the weight of the evidence and must only determine if the jury verdict was supported by substantial evidence. However, Kendel's argument is that she proved all the elements of her claim. This argument ignores the fact that Defendants put on witnesses that contradicted evidence presented by Kendel's witnesses and that in some instances both she and her witnesses testified inconsistently. The argument further does not recognize that this Court must review the evidence in the light most favorable to the non-moving party. Therefore, even assuming that Kendel put on witnesses that testified to each element of her claims, she must also show that the evidence pointed so strongly in her favor that a reasonable juror could not have

6

found against her.   Kendel neglects to even discuss Defendants' evidence.   A review of *all* of the evidence is required to determine if Kendel is entitled to judgment as a matter of law.   The Court concludes that in the process of determining if the verdict was against the manifest weight of the evidence for purposes of altering or amending or granting a new trial, it necessarily encompasses an argument that Kendel presented "substantial evidence" to support her claim and that a reasonable juror could not have found against her.

Although Kendel states that the jury verdict was against the manifest weight of the evidence, she does not actually support this argument.   She correctly states that the parties stipulated that she was a member of a protected class.   She argues that she presented credible evidence that Barnes consistently used derogatory and degrading language that was more offensive to woman than men. She specifically states that she and Barbara Meredith revealed that Barnes called woman offensive names.   Plaintiff further states that her testimony revealed that Barnes assaulted her while calling her offensive names and that her notes as presented at trial revealed that he repeatedly used offensive language.

As the Court has stated, Kendel's arguments completely ignore any testimony presented to the contrary.   Howard Barnes testified that he did not remember using derogatory words.   He further denied ever physically assaulting Kendel.   Kendel's own testimony revealed that her notes, upon which she heavily relied at trial, were retyped and "organized" for trial.   She admitted that her typed notes, as prepared for trial, were different than the original, hand-written notes.   For example, Defense counsel questioned Kendel about her hand-written note dated November 21, 2007.   In that note, she memorialized an argument between her and Barnes.   The hand-written note, while specifically detailing the event, does not mention that Barnes used derogatory or

7

offensive terms or that he threatened her in anyway.   In contrast, the typed version of the note dated November 21, 2007, states that Barnes told her that "I smell a fucking cunt."   Plaintiff admitted that she typed her notes at the outset of this case on the advice of her counsel.

### 1.  **Kendel's Witnesses**

#### a.  Carmen Brady

Carmen Brady, who worked in the Union office as an accounts receivable clerk, testified. See Transcript pg. 193-203.   She was the only other person regularly in the Union office.   On direct examination she testified that she heard Barnes use sexually offensive words.   On cross examination, she testified that she never heard Barnes use inappropriate language with or directed at Kendel.   See pg. 203-230.   Kendel never told her she thought Barnes was discriminating against her because she was a woman.   Brady agreed that she never saw Barnes act inappropriate towards Kendel.   Kendel complained to her that Barnes was keeping her out of Union meetings of which she used to be included.   Brady testified that she got all of her information from Kendel.   It became clear from Brady's demeanor on the stand that she was not being straightforward and that she was reluctant to answer and was often evasive when she did answer defense counsel's questions.

#### b.  Barbara Meredith

Barbara Meredith testified that she overheard Barnes using sexually derogatory terms, but on cross examination verified that she never heard Barnes use the terms in the presence of Kendel. See pg. 266-310.   Therefore, these comments could not be the basis for Kendel's claims as she did not hear Barnes say these things.   She further affirmed that she was best friends with Kendel's mother and very good friends with Kendel.   Meredith testified that Kendel told her about an

8

incident in which Kendel alleged Barnes bumped into her and pulled her hair.  She stated that Kendel thought at the time that it was an accident, but that after the fact, she wondered if it was actually an accident.

c.  Annette Sirrine

Annette Sirrine testified on behalf of Kendel.  See pg. 353-370.  Although Sirrine testified that she felt Barnes discriminated against her because she was a woman, she testified that he never called her offensive names.  On cross examination, Sirrine testified that she was regularly at meetings with Barnes and Kendel and that she never observed Barnes mistreat Kendel, make any rude comments to her, or witness any conflict between Barnes and Kendel.  See pg. 370-382. Kendel never informed Sirrine that she felt that Barnes was discriminating against her because she was a woman, although she complained that Barnes was keeping her out of meetings.  In fact, Sirrine testified that the first time Kendel complained to her about Barnes keeping her out of meetings, Kendel was actively campaigning against Barnes.

d.  Barbara Weisgarber

Kendel next called Barbara Weisgarber.  See pg. 394-401.  Weisgarber testified to an incident that occurred during plant negotiations in 2004 ("the 2004 incident).  On direct examination, she stated that she heard Barnes yell that he wanted to take Kendel outside and fight. She explained that she observed Barnes take a few steps towards Kendel.  On cross examination, she clarified that she did not hear what occurred before Barnes statement but that when she walked in there was quite an argument between the two.  See pg. 401-411.  The negotiations were tense. She admitted that she often criticized Barnes, but that she never criticized him for discriminating against women.  She never saw him treat any woman inappropriately.

9

### e.  Sonja Campbell

Kendel called Sonya Campbell to testify as if on cross.   See pg. 411-453.   She testified that she is the current president of the Local, and that she defeated Barnes for the position in 2008. Campbell testified to the incident during the 2004 incident.   She explained that everyone was tense and fighting, but that she did not witness any heated discussions between Barnes and Kendel. Campbell testified that she later spoke with Kendel in the restroom and Kendel told her that Barnes threatened to take her outside and "kick her ass."   She testified to a letter to the Ohio Civil Rights Commission that she signed.   She stated that she did not draft the letter and did not know what it said when she signed it.   She verified that at the time of the letter she was concerned for the safety of her employees based upon what she had been told by Kendel. Campbell further testified that she never got along with Barnes.   During the 2004 incident, she did not hear the alleged exchange between Barnes and Kendel.   She only heard about it because Kendel told her later.   Kendel complained to her that Barnes would not let her help people and would not let her do her work. Kendel told her that Barnes used offensive words towards women.   Kendel told Campbell that Barnes made comments of a sexual nature about Campbell.   Campbell verified that she did not feel that Barnes treated her poorly because of her gender but rather because she did not like him and he knew of that fact.

### f.  Don Kendel

Don Kendel, Kendel's husband, testified on Kendel's behalf.   See pg. 453-475.   He stated that from 1988 to 2003, Kendel enjoyed her job, but she started behaving differently in 2003.   He explained that she became very depressed and did not seem to want to go to work.   He testified to notes that Kendel kept regarding her work environment.   He stated that she would

write things down on little scraps of paper and then when she had a collection of them, their daughter would type them out.   He testified that she was keeping a record because she was afraid.   He testified that he received a call from Kendel on January 7, 2008 ("the 2008 incident").   She was in a panic and told him that Barnes tried to attack her.   He told her to call 911.   He testified that she told him that Barnes yelled at her and as she tried to leave his office, she felt something on her shoulder, although she did not know what it was.   She had no marks or bruises.   The police arrived but did not press charges.   Kendel worked from home until Barnes was defeated in the presidential election.   On cross examination, Mr. Kendel verified that Barnes never disciplined Kendel, suspend her from work, or attempt to terminate her.

### g.  Tina Kendel

#### i.  Direct Examination

Kendel testified on her own behalf.   See pg. 502-605.   She testified to her employment history with the Local as well as her duties throughout her period of employment.   The parties stipulated to the number of employees for purposes of proving the Local was an employer under Title VII.

#### 1.  Intro of Kendel's Notes

Kendel testified to the notes that she kept of things Barnes allegedly did and said to her.   She indicated that she started taking few notes at first and that she thought the behavior would get better.   As the situation did not improve, she started to take more notes to make a record of everything that was going happening between her and Barnes.   She testified that she took the notes because she was afraid that something was going to happen to her.   She explained that she would jot them down on post-it notes or other scraps of paper as a reminder for later.   She would

11

then just put them in her pocket because she was afraid of what Barnes would do if he saw her with them.   She would keep the post its and paper until she got home and then type them.   Eventually, Kendel explained, it became too stressful for her to type the notes out, so she would give the handwritten notes to her daughter.   Her daughter then would keep them in a Ziploc baggie and type them for her.   "Maybe I couldn't do it that night because I was so drained, but the next couple nights or the next week or the weekend, then we would get them notes out that I had taken, which were kind of like reminder notes, and then we would sit down and put them in the computer." Trans. Pg. 527.   When asked if her handwritten notes were complete of all the things that occurred between her and Barnes, she stated that they were not because as they typed her notes, they threw away some of the handwritten notes.   She stated that there were some events that occurred for which they did not have notes for.   She stated that because she started to keep as many notes as she could, "but some of those may have been discarded when we threw them away; but there's some that just aren't in there."   Trans. Pg. 528.

Kendel testified that she was asked to produce these notes during discovery.   She explained that her attorney told her to get her notes together.   "You had told me to get my notes together and then bring them in to you.   So what we did was we tried to get them in order and tried to bring them in to you.   When we did that, we kind of put things in there that we also had that had happened and that people had seen, they witnessed it.   So we put everything together because you told me to put it together and bring it to you for this case."   Trans. Pg. 531-32.   She explained to the jury that when they originally typed the notes, they were not necessarily all in chronological order, so she had moved them around.   Kendel's direct testimony utilized the notes that she organized for the lawsuit.   Plaintiff's Exhibit 33.

12

2.  <u>The 2004 Incident</u>

Kendel testified to the 2004 incident during which Barnes allegedly threatened to take her out to the parking lot and "kick her ass."  According to Kendel, she and Barnes were part of committee negotiating on behalf of Heinz.  The negotiations were tense and Campbell, who was also present, was not on the same page with Barnes with regard to contract terms.  As such, the committee was losing a lot of things in the contract and as they were sitting there, Barnes "just went off on me and started saying things, started saying things off the wall to me."  Specifically, she testified that he said "'You know what you're doing.  You need to quit looking at me like that.'  I said, 'What am I doing?' Then he said, 'You need to quit looking at me with those eyes. You need to quit looking at me.  You know what you're doing.'  I said, 'No, I don't know what I am doing.'  He got irritated and he said, 'Let's go out in the parking lot and I'll kick your ass right now.  Let's go.  Let's go.'"  Trans. Pg. 530.  Kendel testified that this incident upset her.  Prior to this incident, Kendel testified that Barnes constantly said discriminatory things about women, for instance, that women were dumb, women did not know what they were talking about and that women needed to keep their mouths shut.  She testified that Barnes said these things in front of her and that it started in 2003.

3.  <u>The 2003 Incident</u>

Kendel testified that in late 2003, Barnes pushed her and pulled her hair.  She testified that she was standing at the end of a filing cabinet in a very narrow hallway and Barnes walked past her and "kind of knocked into me.  And I—he kind of stopped a minute, and as he walked forward, then my hair got pulled from the back and, you know, I thought it was just an accident.  And I even said to him, 'Pardon me.'  So I thought it was an accident."  Trans. Pg. 534-35.  She stated

13

that at the time, she did not think that Barnes pulled her hair.   She testified that the incident was not in her notes because she thought it was an accident.   Eventually, however, she spoke with Barbara Meredith about the incident because "he started doing things and saying stuff to me, I started thinking something is going on here, when he pushed me, I don't think this it was an accident."   Trans. Pg. 537.

4.   <u>The December 2, 2004 Note</u>

Kendel testified that she was concerned about guns in the work place because Barnes had guns and had stated that he was not afraid to use them.   Specifically, she testified to her note on December 2, 2004 in which she wrote that Barnes said "People want to fuck with Howard Barnes.   I'll show them who they're dealing with.   You got to treat people like horses and dogs.    You got to beat them down until they do what you want.   Train them.   People better quick fucking with Howard Barnes.   I will show them.   I've got guns and I'm not afraid to use them."   Trans. Pg. 538.   She testified that she had been sitting at her desk when Barnes came in to her office, "leaned against the filing cabinet for a while, stood there for a minute and he started saying this stuff."   Id.   Kendel testified that this concerned her.   She stated that there were several occasions when Barnes would stand by her filing cabinet and stare.   She stated sometimes he would stare at her for five minutes, although it seemed like more.   Sometimes, according to Kendel, he would stand there for more than five minutes.

5.   <u>Barnes' Comments about Other Women and Kendel's Request to the Executive Board.</u>

She explained that often Barnes would not tell her about times and places of meetings so she could not attend, or Barnes would tell her the wrong time so that she would show up to

meetings late.   She explained that she respected Barnes position as president and she would not have treated him the way he claimed she did.   Kendel testified to her notes, and stated that Barnes threatened, isolated and belittled her throughout 2004.   Kendel further testified that in July of 2005, Barnes "came into my office very angry.   Discussed discrimination E-mail sent to International by Annette Sirrine, stating 'That fucking bitch going behind my back to the International.   Who the fuck does she think she is?   That cunt needs to learn her place.   No one does that to Howard Barnes and gets away with it.'"   Trans. Pg. 547-48.   Kendel testified that Barnes used the word "cunt" frequently in the office and in her presence.   She stated that she told Barnes that she did not appreciate that type of language and she stated that the word made her "feel terrible.   It made me feel sick, made me feel nauseous.   It made me feel afraid."   She stated that she complained to board members about the office environment and how Barnes was treating her, but that no one did anything.   She explained that she informed Louie French, vice president of the board of Barnes actions.   Barnes "was coming at me on a constant basis, you know, saying these words, these words about women.   I felt he was saying them about me.   And it was getting worse and worse and I couldn't take it anymore.   I didn't know what to do.   I was reaching out to whoever I could to get help."   Trans. pg. 549.   Kendel stated that French did not help her and in fact informed her that Barnes had told him that she was doing the same thing to him.

Kendel testified at length about how Barnes intentionally tried to keep her out of meetings or to make her look bad in front of the executive board or the membership.   She asserted that Barnes called her a "Goddamn liar" and a "fucking bitch."   Trans. Pg. 553-554.   She alleged that Barnes made comments about her breasts explaining that "just just started coming at me, started getting angrier as he stood there, that he wasn't stupid, that I think I know everything, and he took

15

his arms and went, 'You cross your arms over them big breasts and you think you know everything.'" Trans. pg. 555. Further, Kendel stated that as well as once told her that he could see her g-string out of the back of her pants. She explained that Barnes told her that if he was "hanging out all over" he would want someone to tell him. Kendel denied ever wearing a g-string.

Kendel further testified that she asked the executive board for help with Barnes. On January 9, 2006, she testified that she told the executive board that she "basically told them that I was working under a bad environment, a hostile work environment at work. He's constantly saying derogatory things about women to me. He is constantly berating me, that Howard Barnes was –is discriminating against me, harassing me. I'm working under a work environment that I had been put under this union office that none of our union members –we will not let any of our union members work in that environment when they're out in the plants." Trans. Pg. 557. She told the board that she felt he would not have been doing these things to her had she been a man.

Kendel testified that Barnes told her about a conversation he had with a member. He informed her that while he was talking to the member, the member's "wife was chirping in the background. He said, 'If my wife did that, I'd knock her down and she wouldn't do it to me again.'" Trans. Pg. 559.

### 6. The March 30, 2007 Note

Kendel further testified to a note from March 30, 2007, which purported to document an incident in which Barnes came in to her office and said "'My wife got a job at Coastal Pets.' He said, 'They wouldn't leave her alone. This lady treated her so badly she couldn't even stand to work there. I told her, 'Why didn't you kick her in the cunt? That way, you would show her and

16

she should be afraid of you.  She wouldn't mess with you after that.  You got to show people. You got to make them afraid of you so they won't know what you're going to do.  Once they're afraid of you, they won't mess with you,' that type of thing."  Trans. Pg. 559.  She verified that this happened more than once.

### 7.  Further Direct

Kendel stated that on November 27, 2006, Barnes stated that he would "find who's trying to fuck with Howard Barnes and take care of them.  I told – I told Howard this treatment to me must stop.  It is not right, legal.   He became angry and stared at me for five minutes and left my office."  Trans. Pg. 561.  Kendel affirmed that she used curse words at work, in front of Barnes. She stated that Barnes informed her that people were talking about him and calling him the "anti-woman president."  Trans. pg. 563.

Kendel continued to testify to the typed version of her notes, throughout which she alleged that Barnes used discriminatory language, threatened various woman including Kendel, and made comments that women were dumb.   She stated that this language and the various comments made her uncomfortable and made her feel as if she was in danger.   At one point, she explained that Barnes called her a "fucking cunt" and she told him to stop or she was going to leave.   He told her to "'sit at that desk and you will do what I tell you to do.'"   When she protested he told her that "'You will sit at that desk, and if you get up from that desk, I will get you for insubordination.'" Trans. pg. 568.   Another note explained that Barnes mentioned her eyebrows and to fix her shirt in the back because it "'Looked like a turkey's ass.'" Trans. pg. 569.   Several notes referred to Annette Sirrine and how Barnes called her a "cunt."  Trans. pg. 570-71.   Another note stated that Barnes told Kendel that "'Liz Nemeth is the worst thing that ever fell out of a fucking cunt.'"

17

Kendel also explained that according to her March 30, 2007, note, Barnes talked about her menstrual cycle.   Specifically, Barnes informed her that he "had seen my pad belt sticking out of my pants when I was on my period.   Said he could see everything and that it was getting bad every month.   I told him that he did not know what he was talking about, and I did not want him saying things like that anymore. *** I told him he needed to stop."  Trans. pg. 578.   She further explained that on August 7, 2007, Barnes called her into his office and told her that he wanted to tell her something.   He said "'If my zipper was down and I was hanging out all over, I would want you to tell me.   Well, last week, your shirt was up and your G-string was sticking out of the back of your pants.   It was that time of the month, right?   Last week?   Everything was sticking out."  Trans. pg. 582.   She stated that she did not wear G-string and that she did not know what he meant.

### 8.   The Nov. 21, 2007 Note

Kendel testified that on November 21, 2007, Barnes "came in the office after morning union membership meeting.   He wanted to argue.   Leaned on my desk, fit pounded desk."   She further explained that he said "I smell fucking cunt" and that "I think sabotage is going on and I'll find out.   I'll go off and you don't want to see what I'll do."   Kendel testified that she left the office at that time.

### 9.   Hostile Work Environment

She verified that she believed she was in a hostile work environment because of her gender. She testified that Barnes stated that "Women need to be beat down," "Women need to learn how to suck cock," and "That's all women were good for," "Women are dumb," "Women are cunts and their vagina needs to be sewed up," and "You better be afraid of me.   I'll bring my guns out and

18

bury you in a hole in my yard."   Trans. pg. 586.

### 10. The 2008 Incident

Kendel testified to the 2008 incident.   Trans. pg. 587-592.   She stated that Barnes called her into his office and proceeded to yell at her about lost time sheets and how she was handling time requests from union members.   She alleged that Barnes accused her of "stuffing votes in [her] bra."   Trans. pg. 588.   She testified that Barnes continued to get angrier and angrier, and she got nervous and did not know what to do.   She told Barnes she was leaving and they could finish the conversation when someone else was present.   She got up to leave and Barnes came after her as she left and pulled her shoulder.   She went to her office and turned around and told Barnes that he tried to choke her and that he needed to stop.   She then called her husband on her cell phone. He told her to leave the office and she called 911 from her car.   As a result of this incident, Kendel wrote a letter to the International as well as to the Local executive board.   She explained that she wrote the letter because she felt she was out of options and because Barnes had become physical. Kendel testified that she worked from home until Barnes was removed from office.   Kendel stated that she could not leave her job because she had five children.   One of her children has cerebral palsy and therefore Kendel needed the insurance.

### ii.   Cross Examination of Kendel

On cross examination, Kendel testified that she took handwritten notes of the alleged discrimination.   See Trans. pg. 605, Def. ex. 1016.   These notes were taken contemporaneously with the events they documented.   She further verified that she typed up those notes and submitted them to the Ohio Civil Rights Commission.   Trans. pg. 606, Def. ex. 1018.   She then testified that a third set of her notes was prepared at the request of her attorney at the outset of this

19

lawsuit.   Trans. pg. 608, Def. ex. 1017.   Defense counsel sought to highlight the discrepancies between these various exhibits.

### 1.   The Nov. 21, 2007 Note

To highlight how Kendel's recitation of the events differed from one version of the notes to another, Defense Counsel led Kendel through a specific date in each version of her notes. Specifically, Kendel was asked about a handwritten note dated November 21, 2007, which was written on that day or shortly thereafter.   Trans. pg. 610.   Def. ex. 1016-28. The note referenced an incident in which Barnes came into her office and was argumentative about reports being way behind.   According to Kendel, she informed Barnes that the reports were all caught up and that the Local was making money and interest and that everything was fine.   Barnes became irritated and said that he thought something more was going on because executive board members were calling him at home.   He stated that he believed it was sabotage, and if he found out who was responsible he would go off on them.   He stated that Kendel did not want to see what he would do.   Kendel informed Barnes that the reports were caught up and asked why the board members did not call her.   She wrote that she felt *that* was sabotage.

Kendel testified that the note dated November 21, 2007 was not included in the typed notes sent to the Ohio Civil Rights Commission, yet was included in the notes prepared for the lawsuit. Kendel testified to the note as prepared for trial.   Def. ex. 1017-19.   The lawsuit version did not mention that Barnes was argumentative about the reports.   Further, this version of the note indicated that Barnes pounded his fist on her desk said that he "smell[ed] a fucking cunt" and said that he was very angry.   This was not in the original, handwritten note.   When questioned as to why the typed note included the addition, Kendel testified that Barnes actually came into her office

20

twice that day to discuss the same issue and that was why there were two different accounts of what appeared to be the same incident.   Kendel stated that there was a handwritten note about the second time he came into her office that day, but that she could not point to it.  She further explained that "[t]he period of time between the first time and the second time he came in was—it wasn't that long, and he was trying to get a reaction of me the first time he came in and I—you seen the handwritten note.   And so when he didn't get—he just seemed like he wanted to come back and try it again."  Trans. pg. 624.   When again asked why there was not a handwritten note to reflect the second incident, she indicated that it had been discarded.

### 2.   The March 30, 2007 Note

Kendel was also questioned about a handwritten note about events that occurred on March 30, 2007.  Trans. pg. 626.   According to the handwritten version, Barnes was discussing his wife's job and how one woman treated her badly.   Barnes stated that he asked his wife why she did not kick the woman in the "cunt" because that would have shown her.   He informed his wife that you have to make *people* afraid and then they will leave you alone.   The version of the note typed for the Ohio Civil Rights Commission was identical to the handwritten note.  Trans. pg. 627.   However, Kendel further testified to the version of the note created for the lawsuit. Notably, the version of the note created for the lawsuit changes the word "people" to "women."   It further contained a new paragraph regarding some of Kendel's previous testimony about Barnes asking her questions about her menstrual cycle and then standing in her office and staring at her for five minutes.   Again, Kendel attempted to explain that this new paragraph was included in her handwritten notes, just not in the March 30,2007 handwritten note.   She further indicated that Barnes made these statements several times.

21

At one point in her cross examination, Kendel was so elusive in answering counsel's question that the Court stopped the proceedings, excused the jury, and instructed Kendel to answer the questions posed by opposing counsel.[1]  Pg. 632.   The Court explained that if she continued to volunteer information beyond the scope of the question, that the Court would so instruct her in the presence of the jury, if necessary.

Kendel admitted changing the March 30, 2007 note from "people" to "women" and adding that Barnes said women needed to be kicked in the "fucking cunt."   When asked which version the jury should believe, Kendel responded that they should believe both versions "because they both happened."  Trans. pg. 637.  She denied changing the note to bolster her claims in this lawsuit.

### 3.   Remaining Cross of Kendel

Defense counsel specifically asked Kendel the importance of her notes.   "These notes are important for a number of reasons, are they not?   One of them being many of the things that you claim that Howard Barnes has said and done to you was only between the two of you, correct?   Kendel agreed.   Trans. pg. 648.   Kendel verified that in late 2003 or early 2004 she had concluded that Barnes thought she was a threat to his position as president.   She believed that Barnes thought she wanted to take over as president.   He then started keeping her out of meetings that she had previously attended.   She verified that as president of the Local, Barnes had the right to determine who would go to negotiations and other meetings.   Kendel admitted that Barnes only excluded her from meeting that he had a right to exclude her from.   Despite his right to do so,

---

1 The Court's instruction to Kendel will be further discussed with regard to Kendel's later argument that the Court showed bias or prejudice in favor of Defense (section ii).

Kendel did not agree with this decision and complained to Barnes.   She began documenting how he kept her out of meetings.

Kendel testified that she used bad language in front of Barnes.   She explained that the only time Barnes used crude or coarse language was when he was angry.   Kendel stated that her testimony was that Barnes said that women were dumb, but that that was not in any of her typed or written notes.   Trans. pg. 664.   She further verified that the phrase "women need to be beat down" was not in her written or typed notes.   She affirmed that the only place these statements were asserted was in her complaint.   Kendel testified that Barnes called her a "cunt", or a "fucking cunt," directly, however, she affirmed that she had previously stated during her deposition that Barnes never directed the term toward her.   Trans. pg. 667.   She agreed that when Barnes got mad at either a man or a woman he used profanity.

Kendel testified that the situation got to the point where she and Barnes did not like each other.   Trans. pg. 672.   She complained to the executive board that she was upset because Barnes kept her out of meetings.   She asserted that if she were a man, Barnes would not have kept her out of these meetings.   She verified, however, that Barnes did not keep all women out of the meetings. Kendel agreed that there was no mention in the minutes of the executive board of her ever complaining about Barnes' behavior.   Trans. pg. 742.

With regard to the January of 2008 incident, Kendel explained that although she suffered no physical injuries, she asserted that she suffered emotional injuries.   Trans. pg. 744.   She agreed that there were no witnesses to the incident.   She explained that she went to the prosecutor's office after the incident, but that the prosecutor did not pursue charges.

Kendel agreed that the alleged assault occurred about ten days before the election for the

president of the Local.  She explained that she actively campaigned against Barnes and told people all of the alleged acts and things Barnes had said about her and other women.  Kendel could not recall if she told people about the alleged assault, but agreed that she went to factories to hand out campaign literature for Campbell about a week after the incident.   She stated that it was not the first time she told people about Barnes, and Barnes ended up losing that election.   She identified campaign literature that, in part, discussed how Barnes kept her out of negotiations. Despite this inclusion, she swore that she had no involvement in the preparation of these documents.  Trans. pg. 750.   She verified that she did not lose any money in wages as a result of anything that had to do with Barnes.

Kendel further identified a letter that she wrote to the International and the Local and stated that it was the first time she provided anything in writing to the Local concerning her complaints of discrimination and inappropriate language.   She stated that Barnes never tried to fire or otherwise discipline her.   Kendel testified that she identified John Tracy, Marvin Russow and Mark Whaley from the International as people who had observed inappropriate behavior from Barnes towards her.   She further stated that she complained to them about how Barnes treated her.

### iii.   Redirect Examination of Kendel

On re-direct, Kendel testified that people at International saw how Barnes isolated her. See pg. 762-771.  She explained that by "isolate" she meant that he would exclude her from meetings and when she was at meetings, he would treat her as if she was invisible.   She explained that she had conversations with her doctor regarding her issues with Barnes.   She stated that she never filed a motion at an executive meeting because she did not think it would go anywhere because she had no support on the board.

24

Kendel explained that the version of the notes that she created for the lawsuit were simply her written notes in chronological order, and that she created this version after her attorney told her to get them in order.   Trans. pg. 768.   She explained that after they were typed, she never went over the notes she created for the Civil Rights Commission.     She testified that she did not attempt to exaggerate or expound on anything that was not true and that the lawsuit notes were truthful. She stated that she used her memory to create some of the typed up versions of the notes and that there were not written versions of some notes.   "We tried to keep those notes as best we could and as accurate as we could, but there are some things that I missed.   And as you go back and look at things, you remember."   Trans. pg. 769. She further testified that Barnes called her a "fucking cunt" as she was walking away during the 2008 incident.

iv.   <u>Recross of Kendel</u>

On re-cross she affirmed that she had previously stated that Barnes had never directly called her a "cunt."   See pg. 771-775.   She affirmed that that previous statement was true and that he had never called her a cunt to her face.   She explained that when he called her a "cunt" during the January 2007 incident it was not directly at her face.   She further stated that when she spoke to her doctor about Barnes, she told him that there was a man at work that was trying to get her fired, not that he was discriminating against her.

At the close of Kendel's testimony, she rested her case.

2.  <b><u>The Defendants' Case</u></b>

a.   <u>Kathleen Tatarsky</u>

The Defense called Kathleen Tatarsky, attorney for the Local.   See pg. 798-815. Tatarsky testified that she had been the Local's attorney for 15 years.   She stated that she referred

25

the Kendel complaint to another attorney because she felt she would most likely be a witness.   She explained that approximately 90% of her practice for the Local was processing grievances and arbitrations.   She testified that as the Local's attorney, she met with Barnes three to four times a week.   Tatarsky stated that she always respected Barnes and that he was diligent and always took her legal advice.   She felt that he tried to do the best he could to represent the union members. She testified that Barnes always treated her with respect and that they had a very good professional relationship.   Tatarsky never observed Barnes treat a woman inappropriately or use inappropriate language towards women.   She explained that Barnes complained about Kendel not being in the office and that he would often have to answer the phones and take complaints from union members.   Tatarsky often spoke with Kendel regarding union matters and also considered her a friend.   Kendel never complained to Tatarsky about Barnes. Tatarsky stated that when Barnes first became president, he and Tina had an excellent relationship.   Around 2004, according to Tatarsky, Barnes became more comfortable with his skills and negotiations and talking with company officials.   She stated that she believed that Barnes was trying to assert his leadership, and that Kendel was the more aggressive of the two and she was trying to take over things.   As Barnes became more comfortable, she noticed stress between the two that concerned her.

On cross examination, Tatarsky stated that if people testified that Barnes called women "cunts" and "fucking cunts" it would offend her and that it would surprise her if Barnes used those words because it did not seem like he would.   See pg. 815-818.   She verified that she did not attend executive board meetings and therefore did not know what was discussed there.

### b.  Victoria Sellers

Officer Victoria Sellers testified that she responded to the Local office on January 7, 2008.

26

See pg. 819-825.   She stated that it was her understanding that there had been an assault, but upon further questioning it was determined that a physical assault had not occurred.   The officers informed Kendel that they could not take a report for an assault as there had been no physical contact between them and advised her that she could contact the prosecutor's office and get further legal advice about what had occurred.   She stated that officers gathered that things were just not going well between them at work.   On cross examination, Officer Sellers stated that Kendel informed them that there was no physical contact between her and Barnes.   See pg. 825-829.

### c.   Marvin Russow

The Defense presented the videotaped deposition of Marvin Russow.   See pg. 829-851. Relevant to the instant case, from 2004 to 2006, Russow was the executive assistant to the director of the manufacturing and processing division of the International Union.   From 2008 to the present, Russow was an International Union Vice President.   He explained that the International Union is the chartering body of all local unions.   He explained that the broad ruling and governance of the local unions come from the International Union constitution.   He stated that in 2005, he was told that the Local was having difficulty with their contract negotiations and was asked to assist.   He attended two separate negotiations, one between Heinz and the Local, and the other between Kraft and the Local.   He met Kendel at the Heinz negotiations.   He explained that he did not ever know that there was any tension or problems between Kendel and Barnes.   Kendel never talked to him about the way Barnes was treating her.   He never noticed a time when Barnes seemed upset, angry, or in any way directed any negative issues toward Kendel.   Further, he testified that Kendel never talked to him about the way Barnes treated her.

27

d.  Tricia Ross

Next, the Defense presented the testimony of Tricia Ross.  See pg. 851-874.  Ross was a member of the Local and knew Kendel and Barnes.  She stated that she was on the grievance committee.  She stated that in the early 2000's Kendel and Barnes got along well and worked well together.  She stated that she did not observe Barnes do anything inappropriate towards women or say anything she considered degrading towards women.  She testified that she held the position of recorder on the executive board from January of 2007 to January of 2011.  She stated that she became recorder because Barnes called her and asked if she would be interested in the position. Barnes told her that he had a lot of respect for her and thought she would do the job well.  As a result, the executive board appointed her to the position.  She testified that she attended the executive board meetings as well as the general membership meetings.  As the recorder, she would write the minutes of the meetings and then read them at the next general membership meeting.  She stated that during the time she was recorder, she never heard Kendel complain that Barnes was discriminating against her because she was a woman, or that Barnes was using inappropriate language at work, or that she felt that there was a hostile work environment at the union office because of her gender.   Kendel did talk to her privately about Barnes, but she was complaining that she thought he was an "f-ing idiot," stupid and that he did not know what he was doing.  During these private conversations, however, Kendel never informed Ross that she felt that Barnes was discriminating against her because she was a woman or that he was using inappropriate language toward her.  Ross testified that she once saw Kendel's underwear above the back of her pants and that it was either a g-string or a thong.  On cross examination, Ross stated that she did not know the difference between a thong or a g-string, but she saw Kendel with

28

underwear that had a string that went across the top that she could see up on her back.

### e.  Kelly Smallcomb

Kelly Smallcomb testified that she was a member of the Local and that she had held positions within the organization.   See pg. 874-879.   Notably, she testified that Barnes appointed her chief steward.   She further stated that she was a member of the executive board during the time Barnes was president, and that Kendel never complained that Barnes was discriminating against her because she was a woman or that she was working in a hostile environment based upon her gender.   She verified that she had never seen Barnes do or say anything inappropriate to her or any other woman.   On cross examination, Smallcomb testified that though she stated there was sometimes tension between Kendel and Barnes at the board meetings, she never heard Barnes call Kendel names.   See pg. 879-883.   She stated that it would surprise her if people testified that Barnes used the word "cunt" with regard to women between 2003 and 2008.   She testified that Kendel did a good job as far as she knew as secretary treasurer.

### f.  Mark Whaley

The Defense next presented the testimony via video deposition of Mark Whaley, an employee of the International Union.   See pg. 883-904.   In 2004, he was a collective bargaining representative, meaning that he assisted local unions in bargaining.   He was present at the negotiations when the 2004 incident occurred.   He stated that he did not specifically recollect Barnes complaining about union employees or members talking about politics or rumors.   He testified that he recalled meeting Kendel and sitting in a meeting with her.   He explained that Kendel complained to him about Barnes being old and not having computer skills, but nothing about any problems she was having with him.   He stated that Kendel insinuated that Barnes might

29

not be a good president.   According to Whaley, this was the only complaint he heard.   He stated that it made him very uncomfortable that the number two officer in the Local, Kendel, was complaining about the number one officer, Barnes.   Therefore, he explained, he remembered the specific complaint.   He stated that there was "absolutely" no issue with Barnes threatening to beat up Kendel.   He verified that had he observed harassing behavior, he would have reported it to the human resources department as that was the International Union's policy.

### g.   Andrew Morgan

The Defense next called Andrew Morgan.   See pg. 904-913.   He testified that he was a member of the Local and that was a steward, then chief steward and currently a vice president.   He was not on the executive board when Barnes was president.   He stated that he took part in the negotiations when the 2004 incident occurred.   He verified that he did not see Barnes mistreat Kendel during the negotiations.   When asked if he heard from someone else whether there was any tension or problems between Barnes and Kendel at those negotiations, he stated that he heard from Campbell that Kendel informed her that Barnes threatened to take Kendel out to the parking lot and "whoop her ass."   He wanted to say something to Barnes, but Kendel asked him not to say anything.   He testified that he never personally observed Barnes threaten Kendel.   On cross examination, Morgan verified that he was currently running against Kendel for the secretary/treasurer board position.   See pg. 913-916.   On redirect, Morgan stated that this fact would not cause him to come into court and lie.   See pg. 916-920.

### h.   Franklin Mills

The Defense called Franklin Mills, a member of the Local.   See pg. 920-930.   Mills testified that he had known Kendel for 20 years and Barnes for about 10 years.   Mills stated that

30

he previously held the positions of chief steward and negotiating committee member.   He indicated that the negotiating committee was the same as the grievance committee.   He stated that he believed Barnes and Kendel got along and that he never heard Barnes make any disparaging remarks to Kendel.   He stated that he recalled the 2005 negotiations.   He stated that Sirrine was elected to be on the committee, but by the time she was elected, the negotiations were almost done, and therefore, the committee decided not to allow her to take part in that negotiation.   He explained that Barnes did not have anything to do with this decision.   He further explained that it was his job to contact Sirrine to attend meetings, not Barnes.   He explained that he attended the executive board meetings and Kendel never said anything about Barnes and gender discrimination. He stated the Kendel was not shy or timid and would speak her mind.

Mills testified that during the elections of 2008, a flier was handed around to the plants regarding the January 2008 incident.   He stated that Kendel was supporting Campbell over Barnes.   He explained that he talked to Kendel about the incident discussed in the flier and Kendel told him that Barnes got mad at her and tried to choke her.   On cross examination, Mills confirmed that he did not attend every executive board meeting.   See 930-933.   On re-direct he stated that Kendel was present at the meeting when the committee voted to disallow Sirrine into the negotiations and did not object to the exclusion.   See pg. 933-935.

### i.  John Tracy

The Defense next called, by way of video deposition, John Tracy.   See pg. 935-947. Tracy stated that he worked for the International.   He assisted the Local in the summer of 2005 where he met Kendel and Barnes.   He was involved in approximately four or five negotiation sessions.   He did not recall tension or problems between Kendel and Barnes.   He stated that

31

Kendel never complained to him regarding how she was treated in meetings or about problems in the Local office.   He was not aware of any complaints regarding gender discrimination.

### j.   Howard Barnes

Barnes testified on his own behalf.   See pg. 947-977.   He explained that the Local had bylaws of which he was subject, and the International constitution applied to the Local.   He stated that he never threatened to take Kendel out into the parking lot and fight during the 2004 negotiations.   He explained that at a break during the negotiations, Kendel was on the other side of the room, pacing and mumbling.   According to Barnes, Kendel then came over to him and got into his face, asking him what he was going to do.   Barnes asserted that he responded by asking Kendel what she intended to do, "take me outside and kick my ass?"   He explained that she looked startled, backed up, and walked out of the room.   He further testified that he never kept Kendel out of workers' compensation meetings or unemployment compensation hearings.   He stated that he never kept her from board meetings or union membership meetings.   Barnes explained that he did keep her from fourth step meetings and negotiations.

Barnes stated that in July of 2005 he received a letter from the International president regarding an email to the International from Annette Sirrine.   In response, he investigated the situation.   He explained that he called Sirrine and her biggest complaint was that she was called late for meetings and was excluded from negotiations.   He stated that he called the chief steward and asked him to make sure Sirrine was notified of the meetings and then informed Sirrine of the actions he had taken.   Barnes testified that he responded to the International president to inform him of the actions he had taken.   He testified to a letter he sent to International and stated that he never heard any other complaints after the letter.

32

Next, Barnes testified to the alleged comments he made to Kendel regarding his zipper and her g-string.   Barnes affirmed that he remembered making comments to Kendel about his zipper and her g-string and that someone had been in the office and had perhaps seen Kendel's underwear.   He explained that Kendel was in her office with a member.   Barnes looked in to the office to inform her that she had a phone call and Kendel was bent down over a filing cabinet and her shirt was up.   According to Barnes, Kendel's g-string was exposed.   He explained that he did not want to create an embarrassment for Kendel

Barnes stated that in 2002, he ran for president against Campbell and Norma Findlay, Kendal's mother.   Barnes denied ever telling Kendel that he thought Campbell was a whore, a callgirl, a drug smuggler, passed bad check or was a "f-ing b-word" or "f-ing bitch."   He further denied ever saying these things directly to Campbell but verified that he had heard those comments from Bobby Meredith, Tina Kendel and Norma Findlay during the 2002 election.

With regard to the 2008 incident, Barnes stated that he was not pacing, but rather, he was sitting in his chair.   He stated that he did not follow Kendel out of her office.

Barnes testified that when the position of recorder became available as a result of Bobby Meredith's retirement, he recommended Tricia Ross.   He stated that he first recommended Brian Underwood, but Underwood was not interested.   He stated that Ross' gender had nothing to do with his recommendation and that he felt she was the best person at the time to do the job.

Barnes denied ever commenting on Kendal's breast or about her eyes.   He declined ever going in to her office to stand and stare at her.   He denied ever commenting that "women need to be beat down," or that "women need to learn how to suck cock."   He denied ever saying women were dumb, or that women were the "C-word" or the "B-word" or that their "vagina's needed to be

33

sewn up."

Barnes stated that he stopped taking Kendel to negotiations because he felt that he could no longer trust her.   He stated that this was based upon things she had done in the 2004 and 2005 negotiations.   Barnes explained that during a 2005 meeting on some unsettled issues with a company, the parties broke for lunch and when the union side returned to the room, Kendel was not with them.   When they went to look for her, Barnes saw her talking to the company officials and their attorney.   With regard to the 2004 incident, he explained that he was referring to the incident where he asked Kendel if she wanted to take him outside and "kick his ass."   With regard to the 2005 negotiations, he explained that he felt that Kendel was very disruptive.

Barnes stated that in 2006, he became concerned with her work performance.   Specially, he stated that the W-2s were sent out late.   In 2007 he received a call informing him that the Local was behind on sending to International the portion of the member's monthly dues that was supposed to go to International.   Later in 2007, he questioned Kendel about a note she had prepared with regard to an increase in the amount of dues that were paid to International.   He explained that it increased from approximately $14-17,000 to $53,000.   Kendel stated that it was not a big deal and that it would go back down.   He brought it up at the board meeting, and received calls from board members.   As a result, he addressed the issue with Kendel.   He explained that although he was angry, he knew something was wrong.   He denied threatening her, calling her names, or pounding on her desk.

On cross examination, Barnes verified that he never threatened to bring a gun to the office.   See pg. 977-988.   Kendal's counsel solicited testimony that although he testified at trial that he absolutely did not call people certain names or make other statements, at his deposition he often

34

stated that he did not recall making those same statements.

### k.  Mady Gilson

Finally, the defense called Mady Gilson, by way of video deposition.   See pg. 988-1014.
The defense noted for the record that all of the initial questioning was done by Kendel's counsel.
Gilson testified that she was an attorney and had represented the International.   She stated that she
was often asked to do investigations for the International.   She explained that she was asked to
investigate an allegation involving Kendel and the Local.   She indicated that Kendel sent a
complaint to the International president.   She stated that as she proceeded with her investigation,
Kendel gave her a list of four or five potential witnesses and that she spoke to all of the people
Kendel suggested.   She also stated that she met and discussed the issue with Kendel for a long
time.   During the meeting, Kendel went through her letter to the International, and went through
the relevant documents.   She explained that Kendel went through her allegations event by event
and whether she thought others would be able to provide relevant information.   After she met with
Kendel, she spoke with all of the people Kendel identified.   She indicated that she spoke in person
to about a dozen people, including Barnes.   Gilson stated that her general conclusion both as to
Barnes and Kendel was that they used a lot of coarse language periodically around the office.

Gilson testified that Kendel alleged that Barnes was keeping her from doing her job,
undermining her, not allowing her to do her job and not allowing her to participate fully in
negotiations and grievance handling.   Gilson recalled Kendel informing her that Barnes had made
a comment about her not having her shirt tucked in and her underwear showing.   She testified that
her impression after talking with Barnes and Kendel was that there was a lot of acrimony and
hostility between them, largely of a political nature.   She explained that Barnes and Kendel were

35

on opposite sides and the witnesses that she spoke to were either staunch supporters of one or staunch supports of the other.   Gilson testified that she felt that they were both participants in a very difficult working relationship.

Gilson explained that she was not asked to give a recommendation as a result of her investigation.   Rather, she was asked to give her conclusion as to whether there was actionable harassment.   She indicated that her conclusion was that there was no actionable harassment.   She explained that by "actionable harassment" she meant that there was no conduct that rose to the level of being sexual harassment, under federal law.   She did not look into Ohio law.   This testimony, however, was later struck and the jury was given a limiting instruction to not consider this testimony.   She verified that her report stated that Barnes and Kendel's relationship was unprofessional because they were disrespectful toward each other.   According to Gilson, Barnes and Kendel were "hoarding" information.   They were territorial and were not working in a cooperative, profession way.   Gilson stated that Kendel was not personally unprofessional, but that their relationship was unprofessional.   She explained that Kendel was reluctant to share information with Barnes and that she looked for a bad motive in everything he did.   Gilson stated that neither Barnes nor Kendel did anything to try to make the relationship work.   She stated that Kendel clearly did not respect or like Barnes and viewed him as an adversary in a variety of ways. When asked to explain why Kendel viewed Barnes as an adversary, Gilson stated that Kendel believed Barnes was continually trying to undermine her.   She believed Barnes was looking to find fault with her and to get her to resign.   Gilson stated that when Kendel spoke to her about Barnes, she spoke of him in very disrespectful terms and often would make allegations that Gilson perceived to be extreme and unwarranted.   Gilson believed that both were very territorial about

36

what Kendel's responsibilities were and that Kendel thought Barnes was intruding and Barnes thought Kendel was intruding. Gilson testified that she did not believe Kendel's gender played any role in their relationship and that the problem was personal animosity and political enmity. With regard to whether Barnes made any sexually humiliating remarks about Kendel, Barnes denied any wrongdoing and she found that Kendel's statements were more of a "he said, she said[.]" Gilson stated that even assuming Barnes had made some of the comments Kendel described, in her view, they would not have risen to the level of harassment.

Next, Defense counsel questioned Gilson. See pg. 1002-1014. She indicated that although she did not remember the substance of the conversations, she spoke with other people in the office about Barnes and Kendel's relationship. She recalled that everyone stated that the relationship was not working, but no one told her that Kendel was afraid of Barnes. She indicated that Kendel told her that she was afraid of Barnes and that Kendel thought Barnes was a very violent person. Kendel warned Gilson not to tell Barnes what hotel she was staying at because Barnes might try to come after here. Gilson stated that she did not give this statement any credence because she personally did not find anything threatening about Barnes. Kendel also told Gilson that Barnes attempted to choke her, but that she did not believe the statement.

### 3. Kendel's Rebuttal Testimony

With the conclusion of Gilson's testimony, the Defense rested. Pg. 1013. Kendel testified on rebuttal. See pg. 1014-1020.

#### a. Direct Examination of Kendel

Kendel testified that after the 2008 incident Kathy Tatarsky called her to ask what happened. Kendel informed Tatarsky what had occurred. She stated that she also told Trisha

Ross what occurred that day.   Kendel denied ever taking a two week vacation from work and stated that if there was a note to that affect allegedly found on Barnes' desk, that it was false. Kendel testified that during the 2004 incident, Whaley was not in the room when this encounter occurred.   She denied that the events took place as Barnes testified.   She stated that Barnes came up to her and was angry.   She asked him why he was mad and he told her that she knew why he was mad and that she knew what she was doing.   Kendel stated that it was something about how she was looking at him.   Then, according to Kendel, Barnes came at her and told her that he would take her out into the parking lot and "kick your ass."   She testified that Campbell, Weisgarber and Morgan were all in the room when this happened.   Kendel denied ever talking to Barnes about buying a gun.

Kendel testified to a letter from the president of the International, which was in response to her January 2008 complaint letter.   The letter from the president referred to a dysfunctional and unhealthy environment.   Kendel verified that she did not file the January 2008 complaint or this instant suit for political reasons.   She testified that she felt she had been harassed based upon her gender and that her workplace was in fact hostile.

### b.   Cross Examination of Kendel

On cross examination, Kendel stated that Whaley was in the room when Barnes threatened to "kick her ass" but that she was not sure where he was.   See pg. 1020-1022.   When asked if she told him about the incident, she stated that he knew what happened, but that she did not specifically tell him.   She did not ask for help from the International at that time.   She stated that despite Whaley's contradictory testimony, she was not telling the jury that he lied.   Kendel did, however, indicate that Morgan and Campbell were lying when they testified that they were not

38

present for the incident.

### 4.  The Jury Verdict Was Supported By the Weight of the Evidence.

The Court has set forth a lengthy recitation of the testimony in this case to illustrate that essentially none of Kendel's claims were supported by testimony from anyone other than Kendel herself.   While many witnesses testified that they had heard of many of the incidents of alleged harassment, *no one* could testify to first-hand knowledge.   Each witness indicated that she or he had heard of these incidents from Kendel.    In fact, as the Court has painstakingly set forth above, much of Kendel's claims were directly contradicted.    Therefore, Kendel's credibility was directly at issue.   The jury had before it substantial evidence that many of the notes Kendel presented to support her version of the events in question appeared to be fabricated or at least greatly exaggerated after she filed the instant lawsuit.   Evidence of her prevarication regarding her notes could have reasonably led a jury to the conclusion that she fabricated her entire claim.

While it is clear from the testimony that Barnes and Kendel did not get along, it is equally clear that even if a hostile work environment existed, Kendel failed to show that this hostile work environment was *based upon sex*.   In fact, it appears to have been Kendel's tactic to ignore this distinction throughout pretrial and trial as she repeatedly referred to the case, to both the Court and to the jury, as a hostile work environment case.   While she did present evidence of sharp words, anger, and perhaps even shouting, this does not amount to an allegation that the hostile environment was based upon sex.   Quite simply, this case came down to Kendel's accusations versus Barnes' denial.   The Court will not grant Kendel's renewed motion for judgment as a matter of law, her motion for a new trial, or her motion to alter or amend the judgment because the

39

jury chose to disbelieve Kendel's version of events.

### ii.  Prejudice or Bias

Next, Kendel contends that she was unduly prejudiced by several of this Court's rulings adversely affecting the jury's decision because the jury was influenced by this Court's bias.

Plaintiff takes issue with many of the Court's rulings.   Many of these rulings were highly contested issues that were discussed at length during the trial, and thus the Court relies on its decision as stated on the record and will not readdress the arguments at this time.

### 1.  Mady Gilson's Testimony

The Court will not readdress its decision to allow the testimony of Maddy Gilson.   See pg. 988-1014.   In light of all the testimony set out above, noting the inconsistencies throughout, and given what could be described as a pattern of deception by Kendel and her counsel, any error in the admission of Maddy Gilson's testimony was harmless.   Fed. R. Civ. P. 61.

The Court does, however, find Kendel's argument with regard to the Court's limiting instruction on this testimony to be disingenuous, and therefore is compelled to address this portion of the argument.   Kendel contends that the Court gave "an inadequate jury instruction that was buried between the other instructions."   First, while Kendel strenuously argued against the admission of Gilson's testimony, she did not request a post-testimony limiting instruction.   See pg 984 and Docs. 214, 260. In fact, prior to playing the testimony for the jury, the Court informed the parties that it intended to give limiting instructions to the jury at the appropriate time.   Trans. pg 987.   Kendel never requested or argued that the appropriate time for the limiting instruction was immediately post-testimony.   Kendel was silent on this issue, and therefore the argument is waived.   At the close of all testimony, during a discussion with the parties, the Court again

40

explicitly stated that it would give a limiting instruction on Gilson's testimony.   Pg. 1035.   To this end, the Court solicited proposed instructions from the parties.   Pg. 1070-1071.

With regard to the language of the limiting instruction, the Court explained that it was unhappy with the proposed limiting instruction, pg. 1113, and during that discussion, Kendel's counsel stated, for the first time, that the testimony should be struck completely from the record and the jury should be so instructed.   Pg. 1114.   The Court notes, however, that this request was not stated in Kendel's proposed jury instruction on this issue.   Kendel's counsel went on further to explain that the only remedy "since there wasn't a limiting instruction right after her testimony, is to strike it completely."   Pg. 1114.   As the Court explained, Kendel waived any argument that the Court should have given a limiting instruction immediately post-testimony.   From the context of this case and this specific argument, it appears that Kendel specifically did not request a limiting instruction post-testimony so that she could then argue that the Court's failure to do so required the testimony stricken.   Finally, Kendel argued that she was concerned about the placement of the instruction.   Pg. 1114.   She asked that the instruction be moved ahead of Kendel's claims so that it was clear that the instruction applied to both claims.   Id.   The Court, in fact, offered to place the instruction within the general instructions, regarding stricken testimony.   Kendel agreed to this placement.   Id.   The instruction was captioned, in bold, "Gilson Testimony" and was set off from the rest of the instructions.   A copy of the instructions was given to each juror.   For Kendel to now claim that the instruction was "buried between the other instructions" is disingenuous and at best, a wholly invited error.   The Court further notes that once again, despite the Court's specific order that Kendel was to remove any arguments that upon review of the official transcript were not supported by the record, Kendel did not retreat from this completely inaccurate argument.

2.  Gary Feiock's Testimony

Kendel takes issue with this Court's ruling disallowing Gary Feiock's testimony completely because the events he would testify to occurred prior to the time set forth in the complaint and limiting Annette Sirrine's testimony, pg. 8-9, because she could not recall a specific date.  The Court will not re-examine its ruling on these issues and will instead rely on its reasoning as stated on the record.[2]

3.  Uncontested Facts

Kendel further argues that the Court did not read the uncontested facts to the jury and therefore, she was "forced to present the uncontested facts through testimony, which took up a substantial amount of Plaintiff's time."  The Court views this argument, as well as its accompanying footnote, as an argument that the Court improperly denied her request for an increase in time.  The Court denied Kendel's initial request to be taken off the clock because she argued only generalities.  Doc. 286.  The Court noted that she did not specify any particular witness or piece of evidence that could not be presented in the 10 hours allocated by the Court. The Court further noted that "if a request for additional time is made during trial, it shall be accompanied with specific argument regarding why more time is necessary."  Doc. 286.  Despite a clear warning regarding the need to be specific in her requests, Kendel filed a motion for an increase of time again, arguing only in generalities.  Doc. 294.  Kendel filed a supplemental motion for an increase in time in which she stated that she used time because the Court did not read

---

2 The Court notes that its discussion of Gary Feiock's testimony occurred after voire dire on January 18, 2011. Despite this Court's requirement that Kendel order the portions of the transcripts necessary to support her arguments, she did not order this portion of the transcript.  Further, in contradiction to this Court's order, she has reasserted this argument despite any foundation.   Accordingly, it is appropriate for this Court to simply disregard the assertion.

the uncontested facts. A discussion was had on the record on this issue. Pg. 497-498. The Defense argued that it did not believe that Kendel had been using her time wisely and the Court agreed that the record was clear that no additional time was in order. Id. In the instant motion, Kendel does not indicate how she was prejudiced by the fact that the Court did not read the uncontested facts or any argument to support her conclusion that she "ran out of time to even present an adequate rebuttal." This argument is contradicted by the fact that the record indicates that Kendel did not use the entire 10 hours originally allotted to her. Further, she does not explain what testimony she was precluded from presenting that would have had an impact on the ultimate outcome of this case. Accordingly, this argument is without merit.

### 4. Carmen Brady's Testimony

Kendel contends that the Court "overreacted" to her question to Carmen Brady on redirect as to whether she was on medication by immediately stopping the line of questioning and eventually excusing the jury. During cross examination, Brady was very elusive in her testimony. On redirect, Kendel's counsel inquired as to whether Brady was on medication and she responded that she was. Pg. 230. At that point, the Defense objected and the Court called counsel to a sidebar. Pg. 231. The Court then excused the jury to inquire into whether Kendel's counsel knew Brady was on medication prior to redirect and whether it affected her testimony. Pg. 232. As the Court excused the jury, it instructed them the break in the proceedings should have no bearing on their consideration and that it was to clear up an issue before the Court. Pg. 232. The Court asked the witness to step down and spoke with the parties. Upon conclusion of this discussion, the Court had Brady brought forward, and questioned her about her medication. Pg. 238. The Court then had the jury brought in and allowed Kendel's counsel to resume his line of

43

questioning regarding her medication.   Pg. 241.   In her instant motion, Kendel does not explain

how the Court's actions "suggested to the jury that this witness was instructed by Plaintiff as to

what to say."   Accordingly, this argument is without merit.

5.   <u>Deposition Citations</u>

Kendel argues that the Court showed bias because it pointed out a citation to Defendant's

counsel when Defendant could not locate a specific page in a deposition transcript.   Further,

Kendel argues that the Court attempted to sway the jury by making copies of Defendants' exhibits

during cross examination of Kendel.   Kendel argues that the Court was attempting to bring

attention to the jury as to the points being made by Defendant's.

During Defendants' cross examination of Kendel, Kendel was asked to explain the

inconsistencies between several versions of specific notes.   At first, Defendants attempted to

write on the Court projector.   Because the handwriting was not clear, the Court suggested

displaying the notes themselves and stated that the Court would accommodate viewing the

documents side by side.   Pg. 617.   Counsel then attempted to place both documents on the

projector, but the documents were not legible to the jury.   Pg. 618.   As a result, the Court noted

that due to the limited technology, the Court would make copies of each document (exhibit 17-A at

pages 28 and 29) for the jury so they could follow along as they were being reviewed.   Pg. 618.

Kendel's counsel objected because the document that was being passed out was on their screens.

The Court again explained again that it made copies because of the size difficulties in viewing both

of the documents on one screen.   Pg. 622.   Kendel's counsel affirmed at that time that there was

no doubt that the documents were her notes.   Pg. 618.   In her present motion, Kendel attempts to

characterize this exchange as the court's attempt to sway the jury.   The Court, however, made it

44

clear that due to the limits of courtroom technology, the documents as presented on the projector were too small to read.   Pg. 635.   Kendel argues that she was not given a copy of the exhibit, however, when she asked for the document, the Court informed her that she had a copy in her exhibit book.   Pg. 635.   To argue to this Court now that "[t]o this day, Plaintiff is uncertain what was actually given to the jury" is entirely without merit.   The Court made very clear to Kendel the documents that were being presented.

### 6.   The Court's Instruction to Kendel

Kendel further argues that the Court showed bias by excusing the jury during Kendel's cross examination to "insist[] that [Kendel] give yes or no responses, thereby saving time of the Defendants."   In fact, the Court excused the jury to instruct Kendel that "[i]f, in fact, the question calls for a yes or no answer you are to answer the question yes or no.   You are not to volunteer any additional information beyond that called for by the question[.]"  Pg. 632.   The Court further stated that "I direct you to do so now outside the hearing of the jury.   If you continue to persist and volunteering additional information outside of what is called for by the question, or try to explain beyond the scope of the question, then I will have no choice but to direct you in the presence of the jury.   Your attorney will have an opportunity to follow up with additional questions on redirect." Pg. 632-633.   Kendel's testimony on cross examination prior to this instruction was elusive at best.   As such, the Court's instruction regarding her behavior on cross examination was entirely appropriate.   Kendel complains that the Court did not give similar instructions to defense witnesses, yet she does not specifically point this Court to any defense witness testimony that was as egregious as Kendel's.   Instead, she makes yet another generalization.   As such, this argument is without merit.

45

### 7.  "Tipping Off" Defendants to Move for Judgment

Kendel asserts that the Court "tipped off" Defendants to move for judgment as a matter of law because they had not already done so.   A review of the record reveals that at the conclusion of Kendel's witnesses on Friday afternoon, the Court discussed the procedural timeline.   Pg. 777. Notably, the Court indicated that the parties should go through the exhibits together and that the Court would address exhibits on Monday morning.   Id.   Defense counsel specifically asked the Court if, after the exhibits were addressed, if the Court would allow motions at that time.   The Court stated that yes; it would be permitted at that time.   Pg. 779.   On the morning in question, the Court opened the proceedings by stating what had already been previously discussed; that it would address the admission of Kendel's exhibits and then hear any motions.   This was not an attempt by the Court to prompt Defendants' to move for judgment as a matter of law.   Pg. 785. When Defendants did move for judgment as a matter of law, the Court denied Defendants' motion, and the verdict was in favor of Defendants.   Pg. 1050, 1070.   It is unclear how Kendel would have been prejudiced if the Court were to agree with her argument.

### 8.  Court's Demeanor

Kendel argues generally that the Court's demeanor in questioning Kendel's witnesses was inappropriate and demonstrated to the jury that the Court was biased.   She further argues that the jury could hear the undersigned raise his voice at her counsel during a sidebar.   While Kendel fails to support these arguments with any specific showing of prejudice, the Court clearly instructed the jury not to consider any statements by the Court as an indication of how it should conclude the case.   Pg. 500, 1176.

9.  <u>Deposition Testimony</u>

Next, Kendel argues that the Court acted inappropriately by requiring her counsel, as he attempted to impeach witnesses by way of deposition testimony, to read the entire deposition portion that was related to the question presented.   Kendel states that this was "completely inappropriate under the rules."   Kendel fails to expand on this generalization.   However, it became clear to the Court very early on that many of Kendal's counsel's attempts to impeach Defense witnesses were not proper.   The Court had copies of the deposition transcripts to review as Kendel attempted to impeach witnesses.   The Court noted that Kendel's counsel was, whether intentional or unintentionally, misleading the jury by not providing context for previous statements.   In an attempt to avoid jury confusion, the Court adopted a practice to require the relevant context be read to the witness.   This practice was enforced equally among the parties.

10. <u>Racial Slurs</u>

Kendel again asserts the argument that she should have been allowed to solicit testimony that Barnes allegedly used a racial slur.   This argument was made repeatedly before and during trial. See, e.g. Docs. 288, 292, Transcript pg. 265, 438, 498.   As this Court continually stated Kendel's claims were based upon gender, not race.   See e.g. Transcript pg. 444, 491.   Therefore, the alleged racial slurs were never relevant and would have been highly prejudicial.   The Court has clearly stated its position on this point and will rely on its statements and orders as stated throughout the record.

11. <u>Trisha Ross's Testimony</u>

Likewise, the Court will rely on the record with regard to Trisha Ross' testimony about Kendel's work attire and the Court's subsequent jury instruction on this issue.   Pg. 864.   Further,

47

the Court notes that other than a broad generalization regarding prejudice, Kendel makes no attempt to explain what prejudice resulted from this testimony and subsequent limiting instruction.

## 12. Jury Instructions

Kendel raises two issues with regard to jury instructions. First, she contends that the Court should have instructed the jury on mixed motives. Kendel cites to *Desert Palace, Inc. v. Costa,* 539 U.S. 90, 96-97 (2003), to support her jury instruction on this issue. The Court stated on the record that it did not believe that an instruction on mixed motive applied and instead relied upon *Williams v. General Motors Corp.*, 187 F.3d 553 (1999). Pg. 1081. The instant case, despite Kendel's current arguments, was never premised on mixed-motives. From the filing of the complaint, it was clear that Kendel's claim was that Defendants subjected her to a hostile work environment based upon gender. The Court further relies upon its statements and ruling on the record.

Second, Kendel contends that the Court "refused to change the jury Interrogatory to read that Local 17-A and Barnes in his official capacity were also being sued under state law." Despite a full day of discussing jury instructions with the Court, Kendel never raised this issue. The Court gave the parties ample time to review the proposed interrogatories and place any objections on the record. Kendel stated, "Your Honor, we have reviewed the interrogatories…And we're satisfied, Your Honor." Pg. 1149. Instead, Kendel raised the issue to the Court *after* the Court had instructed the jury. Kendel clearly waived this argument. Pg. 1272-1273. Any attempt to place blame on the Court to "refuse" to address an argument that was explicitly waived is without merit.

## 13. Defense Counsel Conduct

Lastly, Kendel raises two issues with regard to Defendants' counsel. She alleges that

48

Defense counsels' demeanor throughout trial was improper and that they filed false documents claiming the Local was not an employer.  These arguments are not supported by the record.  First, when Kendel's counsel raised his concern about Defense counsel gesturing, the Court instructed all parties to refrain from making gestures or otherwise commenting on the trial.  Pg. 501.  Although the Court did not observe the issue raised by Kendel, it nevertheless cautioned the parties.  The issue was never raised again, and Kendel does not attempt to explain any prejudicial effect.  With regard to Kendel's contention that Defense counsel "had lied to the Court[,]" this argument is not supported by the record.

Kendel's renewed motion for judgment as a matter of law, or in the alternative, alteration or amendment of the judgment, or in the alternative, motion for new trial is denied.  Doc. 347.

### IV.    Kendel's Motion for Mistrial (Doc. 348)

Kendel filed a separate motion for a mistrial based upon the admission of Mady Gilson's Testimony.  Doc. 348.  At the outset, the Court notes that Kendel did not move for a mistrial on this ground at any point during trial.  Accordingly, the Court must conclude that this argument has been waived.  See *Jones v. Illinois Central R. Co.,* 617 F.3d 843, 851-52 (2010).  Although Kendel objected to this testimony, she failed to request a mistrial and instead submitted a curative instruction.  "Having bet on the jury and lost, she is not permitted now to seek a new trial on the basis of potential prejudice that was apparent during trial."  Id. at 852

Assuming for the sake of argument that Kendel properly preserved this argument, the motion is overruled.  She essentially makes the same arguments that she made in her renewed motion for judgment as a matter of law, or in the alternative, alteration or amendment of the judgment, or in the alternative, motion for a new trial.  Doc. 347.  To the extent that she reiterates

49

her arguments that Gilson's testimony was inadmissible hearsay, the Court relies upon its reasoning as stated on the record.   This issue was fully briefed and discussed at trial and therefore, the Court will not revisit its ruling.   To the extent that Gilson testified to the ultimate legal issue at stake, the Court issued a limiting instruction, striking that specific testimony from the jury's consideration.   Pg. 1178.   Jurors are presumed to follow their instructions, and instructions are presumed to cure most errors.   *People v. Petri*, 279 Mich.App 407, 414; 760 NW2d 882 (2008). The Court has already discussed, above, the placement of the limiting instruction, and has determined that Kendel waived this argument.

Kendel also argues that the video testimony violated the "rule of completeness."   She contends that "from Mady Gilson's 110-minute deposition, only the most prejudicial part of [her] videotaped deposition was played for the jury."   As this argument was never before raised to this Court, it is waived.   Kendel cites to *U.S. v. Holden*, 557 F.3d 698 (6th Cir. 2009), for the proposition that because she "did not invoke her right to completeness at the time Gilson's partial testimony was being played, does not in any way waive her rights under the rule of completeness." While this is an accurate *partial* statement of the cited case, Kendel fails to acknowledge that the case continues on to explain that "Congress's decision to put the timing of the completeness evidence in the hands of the party offering it weighs against imposing an additional requirement that parties invoke the rule at the time evidence is introduced."   Id. at 706.   Kendel, although she did not waive her right to completeness by not invoking her right at the time of Gilson's testimony, she waived it by NEVER attempting to invoke the right.   Instead, she states in a footnote that she "was out of time to call Gilson on rebuttal.   This Court refused to allow Plaintiff additional time." This is simply not true.   Kendel never requested more time to present Gilson's full video

deposition.   In fact, she never requested more time to present a rebuttal.   In her requests for more time, she never proffered that such time was needed so that she could provide the complete deposition.   Accordingly, this argument was waived.

Kendel's motion for a mistrial based upon the admission of Gilson's testimony is denied.

**V.**     **Conclusion**

For the reasons set forth herein, Kendel's renewed motion for judgment as a matter of law, or in the alternative, alteration or amendment of the judgment, or in the alternative, motion for new trial is DENIED.   Doc. 347.   Kendel's motion for a mistrial is DENIED.   Doc. 348.

IT IS SO ORDERED.


DATED:  March 7, 2012                    */s/ John R. Adams*
                                         Judge John R. Adams
                                         UNITED STATES DISTRICT COURT

51